IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,350

STATE OF KANSAS,
*Appellee*,

v.

CHARLES D. BOWSER,
*Appellant*.

SYLLABUS BY THE COURT

1.

A litigant must prove bias or prejudice from the district court when asserting the judge violated Kansas Judicial Canon 2, Rule 2.3 (2020 Kan. S. Ct. R. 449).

2.

District court judges must fulfill their duties in a neutral manner. A district court judge errs by becoming an advocate for one party or another during plea negotiations. Merely emphasizing the potential benefits of a plea offer does not, however, constitute advocacy.

3.

When the jury asks an ambiguous jury question and the district court chooses one of two reasonable interpretations, there can be no abuse of discretion.

Appeal from Wyandotte District Court; J. DEXTER BURDETTE, judge. Opinion filed October 23, 2020. Affirmed.

*Debra J. Wilson*, of Capital Appeals and Conflicts Office, argued the cause, and *Reid T. Nelson*, of the same office, was with her on the brief for appellant.

*Daniel G. Obermeier*, assistant district attorney, argued the cause, and *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.:  Following several robberies in Kansas City, Missouri, and Kansas City, Kansas, the State charged Charles D. Bowser, Cecil Meggerson, and Dyron King with multiple counts of criminal conduct. Concerned with several allegedly incriminating statements made by Bowser while incarcerated, both Meggerson and King severed their trial from Bowser's. Ultimately, a jury convicted Bowser of 10 counts of criminal conduct, including the attempted capital murder of Deputy Scott Wood. The district court sentenced Bowser to a hard 25 sentence for Deputy Wood's shooting, plus an additional 455 months for the other criminal offenses. Bowser directly appeals to this court, pursuant to K.S.A. 2019 Supp. 22-3601(b). Finding a single harmless error, we affirm.

FACTS AND PROCEDURAL BACKGROUND

We previously considered King's appeal in *State v. King*, 308 Kan. 16, 417 P.3d 1073 (2018). We laid out the key facts as follows:

"Don's Market and Liquors robbery

"On the evening of February 27, 2015, three men wearing black clothing and brandishing guns entered Don's Market and Liquors at 3000 Southwest Boulevard, Kansas City, Missouri. The cashier noticed one of the men was armed with a revolver and another carried a semiautomatic handgun with 'a longer magazine.' The man with the revolver—wearing a white mask and a pair of black and white gloves—came around the counter and demanded money. The cashier emptied the cash from the register into a

2

plastic sack. The robbers then demanded the cashier's wallet, but when he was unable to locate it, he was pushed to the ground. The robbers left with the plastic sack, various types of liquor, cartons of cigarettes, and lottery tickets.

"The store's surveillance cameras showed the man with the white mask was also wearing black and white batting gloves and gray 'boot style' shoes. Another robber was carrying a 'MAC-11 style' semiautomatic gun with an extended magazine. This suspect wore a mask and Nike shoes with a distinctive yellow or white toe pattern. The third robber was wearing all black and carrying a revolver with a wood handle. Surveillance video from a nearby business showed the three suspects exit the store and get in a black four-door sedan with no front license plate.

"Family Dollar robbery

"Around 8:45 p.m. on March 3, 2015, Patricia Pope was working as a cashier at the Family Dollar located at 1225 Quindaro, Kansas City, Kansas. Reginald Jones was a customer in the store at the time. Pope was restocking the shelves when she noticed Jones make his way to the front register to pay for his items. As she walked to the front to help Jones, a taller man with a handgun came through the front door wearing black clothing, a mask, and gloves. The suspect approached Jones and pointed the gun at him. While this was occurring, two other individuals who were wearing dark clothing entered the store.

"The taller suspect spoke to Jones, but Pope could not make out what was said. He then struck Jones in the forehead with the handgun, and Jones fell to the ground, bleeding heavily. While on the ground, Jones was told to give up his keys and billfold. Jones tossed them his keys and said to take his car. But the robbers eventually left the store without taking the keys.

"After striking Jones, the taller suspect grabbed Pope and pushed her toward the counter. Once behind the counter, the man used a tool to pry open the cash register. He emptied the contents of the drawer into a store trash can and then repeated the same process at another cash register.

"While the taller man was prying open the drawers, another robber shoved Pope to the ground near the store's safe, demanding she open it. When Pope said she could not open it, the man fired two shots near her, one hitting the ground by her leg. Pope repeated that she was unable to open the safe, so he fired a third shot over her shoulder next to her face. The robbers left the store with the contents of the cash registers and some Newport cigarettes from behind the counter.

"Pope noticed the taller suspect had on blue 'workman's boots or workman's shoes.' Pope told a responding officer she could tell all three suspects were black males, but she later testified at trial that she could not discern their race. The store's surveillance video revealed one of the men was wearing a hoodie with a large gold eagle on the back. Another suspect wore black and white gloves and had a MAC-style semiautomatic handgun with an extended magazine. All three suspects had a firearm, one of which was a revolver with a wood handle. In addition to the surveillance video, investigators recovered two shell casings and a bullet from the store.

"Shamrock robbery

"Shortly after 10 p.m. on March 3, 2015, three armed men dressed in black robbed a Shamrock gas station at 8505 Woodland Avenue in Kansas City, Missouri. Brenden Foxworthy and Dustin Paquet were working the evening shift. Both Foxworthy and Paquet described one of the robbers as taller than the others. The taller robber, who was wearing a black mask covering his entire face, ordered Foxworthy to open the registers and safe. Foxworthy opened the registers, but when he was unable to open the safe, he was struck several times on top of his head with a gun. Foxworthy fell to the ground where he remained until the suspects left.

"Paquet observed one of the suspects was carrying a handgun with an extended magazine. All three robbers concealed their faces with either a mask, scarf, or hoodie. At some point before Foxworthy was struck, a shot was fired. After the suspects had left the store, Foxworthy heard shots being fired in the parking lot.

"Surveillance footage showed the tallest robber was wearing all black clothing and wielding a semiautomatic handgun with an extended magazine. He was wearing

4

black and white batting gloves and a gray boot style shoe. The second suspect was dressed in all black and wore a mask with a University of Missouri Tiger's logo. He had on two-tone gray gloves and was carrying a revolver with a wood handle. The last suspect wore a black hoodie with a distinctive gold eagle design on the back and a pair of gloves with a faded yellow logo. He also wore Nike shoes with a unique yellow and white toe pattern.

"Foxworthy and Paquet told officers that the suspects took money and bottles of Patron. Video surveillance showed the robbers also took bottles of Rémy Martin, 1800 Tequila, and other bottles of tequila. Officers recovered several bullet shell casings from the parking lot.

"Kicks 66 robbery

"Around 12:45 a.m. on March 4, 2015, three masked men robbed a Kicks 66 gas station at the corner of 79th Street and Wornall Road in Kansas City, Missouri. Dannella Villa, the general manager, was training Derrick Brining that night. Villa saw three armed men dressed in dark clothing with their faces covered run through the front door. All three men were armed with handguns. Villa noticed one of the men had a mask with some sort of design. She described the height of the robbers as 'one tall, one medium, and one short.'

"When they entered the store, Villa and Brining dropped to the ground, and Villa pressed the store's panic button. The tallest suspect and the medium-height suspect approached Villa and demanded money. One of the men came around the counter, and the other jumped over while firing gunshots. After opening one of the cash registers, Villa tried to open another but struggled to do so. The medium-height suspect used his pistol to hit her twice on the top of her head and once on her face. While striking Villa, he said, 'I'm gonna kill you, bitch.' Villa fell to the ground, acting as though she was unconscious.

"While they were behind the counter, the robbers tried to intimidate Villa and Brining by firing several shots near them. The robbers also tried to get Brining to open the safe, but because it was his first night on the job, he did not know how. Brining was

struck several times with the butt of a gun. The robbers fired gunshots at the safe, trying to open it, and one of the bullets ricocheted off of the safe and struck Brining in the knuckle. They eventually abandoned their attempt to shoot open the safe, opting to ransack the store before leaving with the money from the registers.

"Villa saw enough of the tall and medium robbers' skin to discern they were black. The store's video surveillance cameras showed one of the robbers wore a distinctive gray boot style shoe and was wearing black and white Easton batting gloves. Another robber was carrying a revolver with a wood handle, had on two-toned black and gray gloves, and was wearing a mask with a University of Missouri logo. The third robber was wearing a jacket with a gold eagle emblem on the back.

"While entering the store, one of the suspects used a section of picket fence to prop open the door. Officers later discovered the section of fence was taken from a privacy fence located behind the gas station. While examining the fence behind the store, officers discovered a pack of Newport cigarettes and a knotted section of black t-shirt. Officers also recovered numerous bullet fragments and empty shell casings from the gas station.

"7-Eleven robbery

"The final robbery occurred at the 7-Eleven convenience store located at 4331 Shawnee Drive in Kansas City, Kansas. In the early morning hours of March 4, 2015, Dan Bayer was the only person working the overnight shift. Around 1 a.m., Officer Scott Wood with the Wyandotte County Sheriff's Office came into the store. Officer Wood had just finished his work shift and stopped at the gas station on his way home. He was still in uniform and wearing his gun. After selecting some items, Officer Wood went to the checkout counter, where he struck up a conversation with Bayer.

"The robbery began as the two were leaning on the counter and talking—Bayer facing the front door and Officer Wood facing away from the door. Three armed men dressed in black and wearing masks entered the store. They held their guns in the air, announced it was a robbery, and ordered Officer Wood to lie down on the ground. Bayer observed one of assailants was 'noticeably taller' than the others. Before Officer Wood

6

went to the ground, he was able to catch a glimpse of the men. He also described one of the men as 'a bit stockier than the other two and a little bit taller.'

"One of the men came over the counter, grabbed Bayer's arm, and hit him in the head. Another suspect came around the counter while the other positioned himself over Officer Wood. The men ordered Bayer to open the cash register, and after he had done so, they had Bayer place the money in a bag. Bayer was then ordered to hand over his wallet, but when the suspects discovered there was no money in it, they returned it to Bayer. Bayer was then ordered to withdraw money from the store's safe. Bayer withdrew $60 and gave it to them. Two of the suspects wrestled the drawer out of the second register.

"As two of the robbers dealt with Bayer, Officer Wood was lying on his stomach with his hands spread out in front of him. The third suspect held a knee to his back and told him that if he moved or tried anything, they would shoot and kill him. The man patted him down. Officer Wood tried to conceal his gun with his jacket, but to no avail; the suspect discovered the gun and tried to wrestle it from the holster. Unable to free the gun, the robber became frustrated and hit Officer Wood in the back of his head with an object, causing Officer Wood to bleed. The holster strap eventually broke, and the suspect removed the gun. He also took Officer Wood's knife and wallet, which contained cash.

"At this point, multiple gunshots were fired. Bayer could not tell which suspect fired the shots. Officer Wood later testified he could tell based on his training that a revolver and a semiautomatic handgun were being fired at the same time. Officer Wood first felt a pain in his jaw, and his mouth began to fill up with blood. He then felt pain in his right shoulder, left chest, and left abdomen.

"Once the suspects fled the store, Officer Wood—who had remained conscious— radioed dispatch to report that he had been shot. Shortly thereafter, he lost consciousness. The treating trauma surgeon later testified that Officer Wood suffered gunshot wounds to his jaw, left and right shoulders, left chest, and right side of his neck. Officer Wood survived and testified at trial. His gun was later recovered in Clay County, Missouri.

7

"The store's video surveillance revealed the shooter used a revolver with a wood handle. One of the robbers wore black and white Easton batting gloves; another wore dark gloves with a gold band; and the last suspect had on two-toned gloves. One robber wore gray boot style shoes.

"Investigation

"The initial lead came from Kansas City, Missouri, police officers who were able to lift a fingerprint from the pack of Newport cigarettes recovered from behind the Kicks 66. The print belonged to a young black male, Dyron King. Also located on the box of cigarettes was a State of Kansas tax stamp that was affixed by a distribution company. A detective working with the distribution company was able to determine from a code on the stamp that the box was distributed to a group of vendors in the Kansas City, Kansas, area, which included the Family Dollar located at 1225 Quindaro.

"Shortly after discovering the fingerprint, an investigator obtained the GPS location of King's cell phone. That evening, Kansas City, Kansas, and Kansas City, Missouri, officers—as well as various tactical response teams—arrived at 838 North 83rd Terrace in Kansas City, Kansas. When they knocked on the front door, King's mother answered, and one of the officers saw King in the front room of the home. Shortly thereafter, officers discovered two other young black males—Charles Bowser and Cecil Meggerson—in the home. All three were arrested.

"Officers obtained a search warrant for the home. In King's downstairs bedroom, officers located three handguns, including a .357 magnum revolver on the bed. The revolver had a wood handle with a gold emblem. Behind a ceiling tile, officers found a bag containing a large amount of cash resting next to a MAC-style gun with an extended magazine. Resting on the floor were empty coin wrappers; a pair of blue and gray Nike boot style shoes, one with a drop of blood on it; an 'improvised mask' that looked to be made from the sleeve of a t-shirt with a University of Missouri logo on it; and various liquor bottles, including Patron and Rémy Martin. A black hoodie, black pants, and a black jacket were also recovered from the bedroom.

8

"Also in King's bedroom were the keys to a black Lincoln sedan that was parked in front of the house. Officers later learned the car belonged to Bowser. Inside the vehicle, officers recovered a pair of black and white Easton batting gloves; a pair of black gloves with a yellow stripe; a pair of two-toned gloves; a pair of black gloves; a bottle of Rémy Martin; a box of .357 bullets; and another 'impromptu mask' that appeared to be made from a t-shirt.

"Officers obtained a warrant to search Bowser's residence in Kansas City, Missouri. There they found a bottle of Patron in a dresser that also contained mail addressed to Bowser. Officers also located a coin wrapper behind a couch and a shirt matching the description of a shirt worn in the robbery of Don's Market and Liquors.

"When officers booked Meggerson into jail, they took into evidence the clothing he was wearing, which included a pair of black Nike Air Max shoes. They also collected Meggerson's Nokia cellphone, which contained four photographs of Meggerson holding a bottle of Patron and a bottle of 1800 Tequila. The timestamps on the photos indicated they were taken at 11:50 p.m. on March 3, 2015.

"Meggerson's cell phone contained text messages between him and 'Dyron.' One of the messages stated, 'I need them 357,' which was sent on March 4. A detective testified that he believed '357' referred to the .357 magnum revolver that was recovered from King's bedroom. Another text message from Dyron on February 28 stated, 'Don't take it yet. We about to get money. Then we take it when we get a good L.' The phone's call log indicated Dyron called Meggerson's phone three times on March 3, 2015.

"In addition to Meggerson's phone, officers collected an LG cell phone from the living room floor at 838 North 83rd Terrace, and yet another cell phone was collected, though the record is unclear where it was found. An FBI special agent was able to determine one of the phones connected to the cellphone tower nearest the Family Dollar at 8:39 p.m. on March 3, 2015. The Family Dollar robbery occurred around 8:45 p.m. that day. The same agent also determined Meggerson's phone connected to the two cell phone towers nearest the Shamrock 10 times between 9:53 p.m. and 9:59 p.m. The Shamrock robbery occurred shortly after 10 p.m.

9

"After listening to jailhouse phone calls made by Meggerson, officers obtained a warrant to search his girlfriend's apartment. There they found a shoebox containing a wallet with Meggerson's identification. Also in the shoebox were several items such as earrings, necklaces, and sunglasses with the price tags still attached.

"During the course of the investigation, detectives obtained a DNA search warrant for all three suspects. DNA analysis from blood found on two spots from inside and outside the black and white Easton batting gloves revealed a mixture of a major and minor contributors. King was found to be the major contributor to both. Among three contributors to the DNA found inside the black and gray gloves found in the sedan, Meggerson's DNA was determined to be the major contributor. Of the four contributors to the DNA found in the black and yellow gloves, Bowser was the major contributor. Bowser was found to be the major contributor to three stains found on the University of Missouri mask. And Bowser was the major DNA contributor to the knotted fabric found behind the Kicks 66 gas station. King was found to be the major contributor of DNA located inside the blue and gray Nike boot style shoe. The blood found on the exterior of the shoe belonged to Foxworthy.

"Swabbings from the revolver found in King's room revealed blood in one of the cylinder pin housings. The major DNA profile matched that of Officer Wood's to the probability of 1 in 520 octillion individuals. A firearms examiner compared shell casings recovered from the 7-Eleven, Family Dollar, and Shamrock robberies and was able to determine they were all fired from the same gun.

"Investigators recovered footprints from the Kicks 66 gas station which were left behind on a 5-hour Energy box and a folded piece of paper. A forensic specialist determined the impression on the 5-hour Energy box could have been made by the blue and gray Nike boot style shoe recovered from King's bedroom. The same specialist deduced the black Nike Air Max shoes recovered from Meggerson could have made the impression on the folded piece of paper.

"While King was incarcerated at the Wyandotte County jail awaiting trial, he made statements to two different detention officers. On one occasion, a detention officer told King he could not leave his cell during a health and welfare check because the

10

facility was on lockdown. King became agitated and started yelling at the officer, calling him a liar. When the detention officer told King there was nothing he could do about it, the officer walked to another cell. The officer testified he could still hear King tell another inmate, 'I know that bitch is just lying to try and mess with me and he's pissed off that I shot one of his buddies and now he wants to get his.'

"Officer Jonathan Cortes testified about the second statement, which allegedly occurred over an intercom system used by officers and inmates to communicate with each other. King demanded access to a phone so he could speak with a sergeant. According to Officer Cortes, when he denied the requests, King yelled over the intercom that 'he gets the phone and the sergeant . . . whenever he want[s] to because he shot a policeman and that [the officers] fear[ ] him.' Officer Cortes claimed over the next two hours, King repeated multiple times that the officer was just mad because King 'shot [his] boy.' Officer Cortes also testified King said 'he was gonna beat [his] ass and shoot [him].'" 308 Kan. at 17-26.

Originally, the State charged Meggerson, King, and Bowser as codefendants in the 7-Eleven robbery. Concerned with allegedly incriminating statements made by Bowser while incarcerated, Meggerson and King severed their trials and the State pursued two cases—Meggerson and King together, and Bowser independently. The evidence presented by the State in both trials was substantially the same. Where the evidence differed, we have supplemented the facts below.

At the conclusion of Bowser's trial, the jury convicted Bowser of attempted capital murder of Deputy Scott Wood, aggravated robbery of Patricia Pope, attempted aggravated robbery of Reginald Jones, aggravated robbery of Deputy Scott Wood, aggravated robbery of Daniel Bayer, aggravated battery of Deputy Scott Wood, aggravated battery of Daniel Bayer, conspiracy to commit aggravated robbery, criminal possession of a weapon on March 3, 2015, and criminal possession of a weapon on March 4, 2015.

11

DISCUSSION

*Plea Negotiations*

Bowser first alleges the district court impermissibly participated in plea negotiations and imposed consecutive sentences as "the product of judicial vindictiveness" when Bowser rejected a plea offer. Before jury selection, the district court discussed a rejected plea offer with the parties and noted the State offered a 35-year plea deal, but Bowser declined.

The judge explained to Bowser the possibility that, if convicted, he would receive a hard 25 sentence plus an additional 228 months. The judge had previously sentenced Meggerson and King to consecutive sentences. Further, the judge indicated he did not know what Bowser's defense would be, but he knew "what the State's evidence [was] because [he] presided over" the other trial. While Bowser's mother was en route to the courthouse, the judge again entreated Bowser and commented on Bowser's young age and "opportunity to basically have a life" after release. During this conversation, the judge noted several times that the decision was ultimately Bowser's to make. Obviously, Bowser chose to continue with his jury trial.

At sentencing, Bowser's attorney requested all counts run concurrent to the attempted capital murder conviction and Bowser receive no more than a hard 25 sentence. The State requested a hard 25 sentence for the attempted capital murder conviction, plus a series of concurrent and consecutive sentences totaling an additional 455 months. The district court followed the State's recommendations.

We recently distinguished between "judicial comment error" and "judicial misconduct" and explained their respective standards of review.

12

"For decades, we have held: 'The party alleging judicial misconduct bears the burden of establishing that misconduct occurred and that the misconduct prejudiced the party's substantial rights.' And we have reviewed judicial comments that are not jury instructions under this generic judicial misconduct standard. But today, we clarify that an erroneous judicial comment made in front of the jury that is not a jury instruction or legal ruling will, from now on, be reviewed as 'judicial comment error' under the Chapman constitutional harmlessness test. See *Chapman*, 386 U.S. at 24. That means the party benefitting from judicial comment error has the burden to 'prove[ ] beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., prove[ ] there is no reasonable possibility that the error affected the verdict,' as with prosecutorial error. Importantly, our holding today is limited to judicial comment error; we do not disturb our existing precedent concerning structural error or other kinds of error traditionally labeled 'judicial misconduct.' [Citations omitted.]" *State v. Boothby*, 310 Kan. 619, 625, 448 P.3d 416 (2019).

Bowser makes a traditional judicial misconduct claim because he alleges the judge abandoned his neutrality and advocated for the plea arrangement. The conduct at issue did not occur in front of a jury. As such, if misconduct is found, Bowser must demonstrate prejudice in order to win a reversal. *State v. Lemmie*, 311 Kan. 439, 450, 462 P.3d 161 (2020).

Bowser asserts the district court violated Kansas Judicial Canon 2, Rule 2.3, concerning "Bias, Prejudice, and *Harassment*." (2020 Kan. S. Ct. R. 449.) It reads in relevant part:

"(A) A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.

"(B) A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in *harassment*, including but not limited to bias, prejudice, or *harassment* based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political

13

affiliation, and shall not permit court staff, court officials, or other subject to the judge's direction and control to do so." (2020 Kan. S. Ct. R. 449.)

At its core, Bowser argues the district court abandoned its neutral role and actively advocated for him to accept the plea deal demonstrating bias and prejudice against Bowser. Examining the record, we are concerned with some of the district court's language. The district court did implore Bowser to consider the consequences of losing at trial and the implications on the remainder of Bowser's life:

"THE COURT: I want to be sure, sir, that you understand. Let's assume for argument's sake that you're convicted of everything that you're charged with. You understand that the punishment for the attempted capital murder is what we call a life sentence. That breaks down into what they call a hard 25, which means you would have to do every[]day of the 25 years—

. . . .

"The second count, which would be the . . . aggravated robbery, if you were convicted of that crime, the—for class B, that's 228 months. The State would ask for and I have previously sentenced your co-defendants to consecutive sentencing for all the crimes they've—were convicted of committing.

. . . .

"Which means, sir, I'm not sure that you're gonna be able to get out of prison in your lifetime. You're gonna be a very old man. I don't—I have no idea what motivates you, sir, and I—I don't pretend to know, but you are a young black man. The plea deal offers you a life or realistic life and I want to be sure that you understand that."

Later, the district court again emphatically urged Bowser to consider the ramifications of a guilty verdict:

14

"I'm going to reiterate some of the things that I've previously said and that is, number one, how old you are now and how old you would probably be if you were convicted on all counts. This plea deal gives you an opportunity to basically have a life."

District court judges must fulfill their duties in a neutral manner. See Kansas Judicial Canon 2, Rule 2.3 (2020 Kan. S. Ct. R. 449). A district court judge errs by becoming an advocate for one party or another during plea negotiations. Merely emphasizing the potential benefits of a plea offer does not, however, constitute advocacy. Here, we are not convinced that the district court's repeated emphasis on the benefits of the plea offer to Bowser constituted advocacy on behalf of one party or the other. While the district court may have come close to the advocacy line, we cannot say that it was crossed. Although the district court displayed a preference that Bowser accept the plea offer, the record reveals the district court judge was genuinely concerned for Bowser's wellbeing. The judge appeared concerned that Bowser did not fully appreciate the gravity of his situation and explained he knew the State's case because he presided over King and Meggerson's trial. The district court went out of its way to provide Bowser additional time to contemplate the plea offer and repeatedly asked Bowser if the court or his attorney could answer additional questions.

While Bowser also suggests his sentence may have been the product of judicial vindictiveness, he offers no support for this claim and we cannot find any in the record. We conclude the district court did not abandon its neutrality and did not commit error.

*Prosecutorial Error Claims*

Next, Bowser claims that several times during closing arguments the prosecutor stated facts not in evidence, constituting reversible error. Specifically, Bowser points us to the following statements from the State's closing arguments:

15

"Mr. Bowser, his DNA was found on the tore up, made up, makeshift mask. Not found at his house, but found in the middle of a street within two miles of a robbery. *Mr. Bowser's jeans that he wore in custody were seen on multiple surveillance videos. The stitching on the side, the red label. Mr. Bowser's DNA was found inside the yellow and the black glove.* I believe the testimony was it was more than 26 cotillion [*sic*]. *He's the only possibility of the person who was wearing this glove as a major donor.*

"There is no doubt that Mr. Bowser was a part of this team. *There is no doubt that Mr. Bowser owned this vehicle, the same Lincoln LS that was seen at the robberies*, the same Lincoln LS that the gloves were found at, the same Lincoln LS that the liquor bottles w[ere] found in, the same Lincoln LS that was not found at his house, but was found at his co-defendant's house. Why? Because they were a team. They rode together, they drove together, and they robbed together.

. . . .

"That's not good enough, let's look at the glove because after he finished wearing the gray hood[ie], he switched out and put on the hood[ie] with the eagle. But he put on the same glove, the same glove with the gold around the wrist and the gold in the middle. And you see the gun in his hand, the *same glove that only one person on Earth could possibly have that DNA. That's Mr. Bowser's glove*.

. . . .

"Well maybe it was [D'Andre] Harris. [D'Andre] Harris had a gun. [D'Andre] Harris was arrested. You heard both the Kansas City, Missouri trooper as well as the detective here in KCK. He said, I saw him. I talked to him. I investigated and then I ruled him off. But if that's not good enough, *you heard the DNA expert who testified on multiple occasions that she tested Mr. Harris' DNA as well and the only place that his DNA came up was on the gun that he had. It wa[s]n't on the liquor, wa[s]n't on the gloves*." (Emphases added.)

And then in rebuttal:

16

"What I'm gonna say is what we know is not circumstantial. It's DNA. DNA is not circumstantial evidence. And there has been nothing offered to say why his DNA is found on the very things that he concedes apparently that his friends were involved in. And the only reason that he's here is because of his friends per his counsel. Who your friends are has consequences. But his friends' DNA was not the only ones found. His was. *His car was seen*. He was in the video." (Emphasis added.)

Bowser alleges these statements were error because (1) Bowser's jeans were not seen in "multiple surveillance videos"; (2) the State implied only Bowser's DNA appeared on the gold-trimmed glove; (3) Bowser's Lincoln LS was only seen on the Don's Market and Liquors (Don's Liquors) video; and (4) the prosecutor argued that Harris' DNA was only found on the gun, but Harris could not be excluded as a contributor to the DNA recovered from the Kicks 66 cloth mask. Bowser claims these inaccuracies fell outside the latitude afforded prosecutors and unfairly bolstered the State's case.

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

See also *State v. Blansett*, 309 Kan. 401, 412, 435 P.3d 1136 (2019).

We will consider each of Bowser's objections in turn. First, Bowser argues the State committed error when it commented that Bowser's jeans appeared on "multiple surveillance videos." Reviewing the trial exhibits, we hold this statement fairly represented the evidence. Police arrested Bowser wearing True Religion brand jeans, and the record contains several photographs. Further, Detective Taylor's timeline, admitted as Exhibit 541, is a digital crime scene summary which permits the user to search for evidence and produces a result highlighting the times and locations that evidence was seen or used in the robberies. The "Jeans" entry produces two results: (1) the Don's Liquors robbery and (2) the Shamrock gas station robbery.

The Don's Liquors robbery entry includes two photos. The first is a screenshot from surveillance "Camera #4," dated and timestamped "2/27/2015 PM 7:05:38.19." The second depicts Bowser's jeans upon his arrest and the same jeans depicted in several exhibits. The security footage screenshot shows one suspect wearing dark blue jeans with a bright white seam that extends only half-way down the pant leg. The jeans police recovered from Bowser upon his arrest have the same bright white seam extending only halfway down the leg.

Similarly, the Shamrock gas station entry includes two juxtaposed photographs. The first is a security camera screenshot from "Camera 4" dated and timestamped "03-04-2015 Wed 03:56:45." The suspect mid-frame is bending over and a white tag with a red outline is visible on the back of the individual's right pant leg at waist level. The second photograph depicts the back right section of Bowser's jeans, where a red-bordered white tag is present above the back right jean pocket. Another admitted photograph displays the inside of Bowser's jeans and a red stitching outline is clearly visible in the same area.

The jury viewed uncut surveillance footage from Don's Liquors and the Shamrock gas station. The jeans in each video contained the bright white seam extending halfway down the pant leg and the red-bordered white tag—and Bowser's jeans contained both

18

features and are the same color. Using the photographs in evidence, Detective Taylor's timeline tool, and the raw surveillance footage, a reasonable juror easily could have concluded the jeans depicted in the Don's Liquors robbery and the Shamrock gas station robbery were the same pair recovered from Bowser when police arrested him. As a result, the State did not err when it stated Bowser's jeans were in "multiple surveillance videos."

Next, Bowser argues the DNA from at least three other individuals was present on the glove with gold or yellow trim. However, Bowser mischaracterizes the State's comments. The prosecutor noted Bowser was the only *major DNA donor* and this was a reasonable inference from the facts in evidence:

> "Mr. Bowser's DNA was found inside the yellow and the black glove. I believe the testimony was it was more than 26 cotillion [sic]. He's the only possibility of the person who was wearing this glove *as a major donor*.
>
>     . . . .
>
> "That's not good enough, let's look at the glove because after he finished wearing the gray hood[ie], he switched out and put on the hood[ie] with the eagle. But he put on the same glove, the same glove with the gold around the wrist and the gold in the middle. And you see the gun in his hand, the same glove that only one person on Earth could possibly have that DNA. That's Mr. Bowser's glove." (Emphasis added.)

In rebuttal, the State again emphasized Bowser was the glove's *major* DNA donor; not the only donor:

> "I told you what he's gonna say. It was all somebody else. One hand, *it was other peoples' DNA as well* [*in the glove*]*, though they were the minor* [*contributors*]. You heard the expert. Don't leave your common sense at the door. *He was the major* [*contributor*]. No reason on why his DNA is found on the glove. . . . Nothing talking

19

about it was a big coincidence, no. Didn't say it wa[s]n't his DNA, but just said also don't forget about Mr. Harris. He may have did it, too." (Emphases added.)

These statements were consistent with the testimony of DNA expert, Forensic Biologist Jennifer McMurray:

> "So the first sample I tested was from the inner wrist of the black and yellow glove . . . . And I developed a mixture *with one major contributor and at least three minor contributors and here the major profile matched Charles Bowser*. The minor profile was not suitable for comparisons." (Emphasis added.)

The prosecutor's statements properly summarized this evidence and explained Bowser contributed the glove's major DNA profile. This was not error.

Third, Bowser claims the State asserted Harris' DNA only appeared on Deputy Wood's service pistol, but Harris could not be excluded as a DNA contributor on the Kicks 66 cloth mask. The defense theory suggested Harris, not Bowser, committed the robberies with Meggerson and King. The theory's lynchpin centered on Deputy Wood's service pistol. Testimony established Missouri Highway Patrol Officer Joseph Hall stopped Harris, searched Harris' vehicle after smelling marijuana, and discovered Deputy Wood's Glock Model 22 service pistol.

Forensic Biologist Jennifer McMurray tested the pistol:

> "I tested swabs from the trigger and a swab from the grip from his weapon and the swab from the trigger had DNA from one major contributor and at least three minor contributors on it. The major profile matched D'Andre Harris and the minor profile was not suitable for comparisons.
>
> . . . .

20

"So the swab from the grip, I also developed a mixture with one major contributor and at least three minor contributors and, again, the major profile matched D'Andre Harris and the minor profile was not suitable for comparisons."

McMurray also tested the cloth face mask with an "MU logo" recovered from the Kicks 66 robbery. She tested four stains and "developed a mixture with one major contributor and at least one minor contributor." McMurray testified the Stain A major profile matched Bowser and the minor profile excluded King, Meggerson, Brenden Foxworthy, Dannella Villa, Derrick Brining, Reginald Jones, Scott Wood, and Daniel Bayer. She listed Harris "as a *possible* minor contributor." (Emphasis added.) Similarly, Stain B had at least three contributors, with suitable comparison samples for Bowser and Meggerson. Results were inconclusive if Harris was a contributor. Stain C showed one major, matching Bowser, and two minor contributors. The first minor profile matched King, and the second was inconclusive. The final stain, Stain D, had one major and a minimum of three minor contributors. Bowser again matched the major contributor, but "the minor was not suitable for comparison."

In anticipation of Bowser's closing argument, the State commented during its closing:

"Well, maybe it was Mr. Harris. Mr. Harris had a gun. Mr. Harris was arrested. You heard both the Kansas City, Missouri trooper as well as the detective here in KCK. He said, I saw him. I talked to him. I investigated and then I ruled him off. But if that's not good enough, *you heard the DNA expert who testified on multiple occasions that she tested Mr. Harris' DNA as well and the only place that his DNA came up was on the gun that he had. It wa[s]n't on the liquor [bottles], wa[s]n't on the gloves*." (Emphasis added.)

The prosecutor's statement properly explained the DNA evidence. McMurray testified she tested the pistol, Harris' DNA matched the major profile of the first swab,

21

and the minor profile could not be compared. The second swab yielded the same result. Harris' was the only DNA recovered from Deputy Wood's service pistol.

Bowser matched the mask's major profiles for all four stains. Meggerson matched a major contributor for Stain B. King was a minor contributor for Stain C. Harris was listed "as a *possible* minor contributor" for Stain A and "inconclusive" for Stains B and C. This means McMurray did not find Harris' DNA on the mask—only that his DNA was a *possible* contributor. The State referenced that McMurray's testing could only conclusively link Harris' DNA to the pistol. The prosecutor's statement was correct, and we are convinced this statement was not error.

Finally, Bowser argues the prosecutor incorrectly stated that Bowser's Lincoln LS "was seen at all the robberies." The prosecutor said:

> "There is no doubt that Mr. Bowser was a part of this team. There is no doubt that Mr. Bowser owned this vehicle, *the same Lincoln LS that was seen at the robberies*, the same Lincoln LS that the gloves were found at, the same Lincoln LS that the liquor bottles was found in, the same Lincoln LS that was not found at his house, but was found at his co-defendant's house. Why? Because they were a team. They rode together, they drove together, and they robbed together." (Emphasis added.)

The State agrees this was error and recognizes the prosecutor should only have specified the Lincoln LS could be placed at Don's Liquors. In light of the strength of the evidence, the State suggests this error was harmless and reversal is not required because "the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record.'" *Sherman*, 305 Kan. at 109.

Here, the State has met its burden to demonstrate the error did not affect the trial's outcome beyond a reasonable doubt. See *King*, 308 Kan. at 35. The trial evidence

22

included 62 witnesses and 600 exhibits, and the State connected Bowser to the robberies with DNA evidence, recovered stolen items from Bowser's vehicle, and video surveillance depicting Bowser's clothing. Police recovered a firearm containing Deputy Wood's DNA and firearms depicted in the surveillance videos from King's house, where Bowser was arrested. This large body of evidence shows that a jury would have convicted Bowser absent the prosecutor's statement. As in *King*, this single erroneous statement was a "minor aberration" stemming from a complex and "prolonged trial." See 308 Kan. at 36.

It is true that a mere volume of evidence cannot be our only consideration. *King*, 308 Kan. at 35. In addition to overwhelming evidence, we are convinced this particular statement was harmless because, in addition to overwhelming evidence, this stray misstatement of fact was cured by other correct evidence. See *State v. Thurber*, 308 Kan. 140, 170, 420 P.3d 389 (2018). Most importantly, the jury possessed State's Exhibit 541—the interactive timeline tool—which displayed the proper place Bowser's vehicle was seen. The entry for "2005 Lincoln LS" links to a single result—the Don's Liquors robbery. The prosecutor's statement was erroneous, but that error did not prejudice Bowser's trial.

Bowser has also attempted to claim an "imaginary script" prosecutorial error. But while the State's brief engages the merits of this claim, Bowser's amended brief does not. Arguments not adequately briefed are waived, and we decline to reach the merits on a claim not briefed or argued. *State v. Pewenofkit*, 307 Kan. 730, Syl. ¶ 2, 415 P.3d 398 (2018) ("[A] point raised incidentally in a brief and not argued therein is also deemed abandoned.").

23

*Ambiguous Jury Question*

Bowser asserts that the district court erred in its response to a jury question. The State pursued an aiding-and-abetting theory at trial. Jury Instruction No. 10 listed the elements of Attempt to Commit Capital Murder:

> "1. That the defendant or another for *whose conduct he was criminally responsible* performed an overt act toward the commission of capital murder.

> "2. That the defendant or another for *whose conduct he was criminally responsible* did so with the intent to commit capital murder.

> "3. That the defendant or another for *whose conduct he was criminally responsible* failed to complete commission of capital murder.

> "4. This act occurred on or about the 4th day of March, 2015, in Wyandotte County, Kansas." (Emphases added.)

The district court received a jury question during deliberations, which asked, "Instruction No. 10, define whose conduct he was criminally responsible." The district court opined to the parties it was "constrained, first of all, to answer the question" and could "only go by the evidence presented by the State and that the answer to the question would be co-defendants Cecil Meggerson and Dyron King, period, nothing more, nothing less." When the district court received the question, it believed the foreperson accidentally excluded the word "for." The district court examined the question and read it aloud to counsel while the jury remained in the jury room:

> "I will read the question into the record: Instruction No. 10, define whose conduct he was criminally responsible for. *He didn't say for, but he's obviously asking.*" (Emphasis added.)

After the jury returned, the judge stated:

24

"We are in receipt of your question and I'm gonna read this into the record: 'Instruction No. 10, define whose conduct he was criminally responsible'. . . . The only way I can answer that question is by giving you the two names of the two co-defendants and that would be Cecil Meggerson and Dyron King, period. No, sir, [you] can't ask me anything else unless you put it in writing and date it."

Bowser provides two rationales why the district court's response was error. First, Bowser points to Instruction No. 10, which did not include the word "for," but read "whose conduct he was criminally responsible." Bowser believes this is a significant difference and suggests that the inclusion of "for" transformed the district court's interpretation from "'*define* 'whose conduct he was criminally responsible'" to "'*identify* whose conduct he was criminally responsible for.'" Bowser speculates the reason the jury foreperson attempted to ask another question was to correct this misunderstanding and argues this response was a mistake of both fact and law and was an abuse of discretion.

Second, Bowser claims the district court's answer invaded the province of the jury by directly telling the jury that Bowser was criminally responsible for Meggerson and King. Bowser believes this error amounted to a directed verdict of guilt if the jury concluded either King or Meggerson committed any criminal offense.

K.S.A. 2019 Supp. 22-3420(d) requires jury questions be "signed, dated and submitted in writing to the bailiff." The district court must "notify the parties of the contents of the questions and provide them an opportunity to discuss an appropriate response." K.S.A. 2019 Supp. 22-3420(d). That response must be given "in open court or in writing." K.S.A. 2019 Supp. 22-3420(d). When examining error we consider "a district court's response to a mid-deliberation jury question . . . for abuse of discretion." *State v. Lewis*, 299 Kan. 828, 856, 326 P.3d 387 (2014) (quoting *State v. Novotny*, 297 Kan. 1174, 1186, 307 P.3d 1278 [2013]). We must ask:

25

"'[T]o the extent that it is necessary to determine whether the district court's response was a correct statement of the law, we are presented with a legal question, subject to unlimited review. But when looking at which legally appropriate response the court should have made, *we accord the trial court the deference of looking to whether no reasonable person would have given the response adopted by the trial court*.'" (Emphasis added.) *Lewis*, 299 Kan. at 856 (citing *State v. Wade*, 295 Kan. 916, 921, 287 P.3d 237 [2012]).

A district court abuses its discretion if its decision (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018). Bowser, as the party claiming the error, bears the burden of showing the district court abused its discretion. *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018). If the district court's response was an abuse of discretion, we must determine if it was clearly erroneous. *Lewis*, 299 Kan. at 856. A judicial action is clearly erroneous "'"if the reviewing court is firmly convinced that the jury would have reached a different verdict had the error not occurred."'" *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012).

We agree with Bowser the jury instruction was ambiguous. The question's vague phrasing lends to two reasonable interpretations. A reader could interpret the question as the district court did here—a request to identify the individuals by name with whom Bowser could potentially share criminal liability—King and Meggerson. Alternatively, a reader could interpret the question as a request for an explanation of the legal aiding-and-abetting concept "whose conduct he was criminally responsible."

That the question has two reasonable interpretations answers Bowser's claim. The district court adopted one of these two reasonable interpretations and therefore did not abuse its discretion. Although Bowser shades the district court's response as a direct invitation to convict him, the district court's interpretation was reasonable and well within the deference provided judges in answering jury questions. See *Lewis*, 299 Kan. at 856.

26

The district court's reply did not invade the jury's province but informed the jury the identities of the two parties the State theorized Bowser assisted in the commission of the various crimes, which would aid the jury in understanding the State's aiding-and-abetting theory. We also note Bowser's attorney discussed the district court's response and his only concern was the district court should include Harris alongside King and Meggerson.

Bowser's suggestion now that the jury foreperson attempted to correct the district court, but the district court prevented him from doing so, actually cuts against Bowser. After the foreperson attempted to ask another question or comment, the district court quickly cut him off and instructed him to provide additional questions in writing, pursuant to K.S.A. 2019 Supp. 22-3420(d). However, the jury never returned with a follow-up during its multiple-day deliberations. We infer from the absence of another question the district court's response adequately answered the jury's question, and Bowser's assertion otherwise is conjecture.

Bowser has failed to show the district court's response exceeded the deference provided judges when answering jury questions. See 299 Kan. at 856. As such, we hold the district court's response was not an abuse of discretion.

*Cumulative Error*

Finally, Bowser argues cumulative error denied him a fair trial. "The test for cumulative error is '"whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant."'" 304 Kan. at 457-58. Having found only one harmless error here, there can be no cumulative error. *State v. Frierson*, 298 Kan. 1005, 1020, 319 P.3d 515 (2014) ("Nor may a single error constitute cumulative error.").

27

Affirmed.

BEIER, J., not participating.[1]

PATRICK D. MCANANY, Senior Judge, assigned.[2]

---

[1]**REPORTER'S NOTE:**  Justice Beier heard oral arguments but did not participate in the final decision in case No. 120,350. Justice Beier retired effective September 18, 2020.

[2]**REPORTER'S NOTE:**  Senior Judge McAnany was appointed to hear case No. 120,350 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.