IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,439

STATE OF KANSAS,
*Appellee*,

v.

DIANTRE MARQUELLE LEMMIE,
*Appellant*.

SYLLABUS BY THE COURT

1.

Any possible constitutional error arising from the district court judge's refusal to suppress evidence that a detective obtained phone passcodes from the defendant was harmless in this case. No incriminating evidence from the phones was introduced in the defendant's trial.

2.

No error occurred in this case when the judge admitted evidence that a coconspirator made two statements after the defendant shot the victim. To the extent the statements qualified as hearsay, they were admissible under K.S.A. 60-460(i)(2), one of the grounds on which the judge relied.

3.

The defendant in this case has not demonstrated judicial misconduct that prejudiced his substantial rights.

1

4.

The State introduced more than enough evidence in this case to convict the defendant of first-degree murder.

5.

There was no abuse of discretion in this case arising from admission of K.S.A. 2019 Supp. 60-455 evidence of the defendant's upset over a missing methamphetamine pipe.

6.

The cumulative error doctrine does not support reversal of any of the defendant's convictions in this case.

Appeal from Saline District Court; JARED B. JOHNSON, judge. Opinion filed May 1, 2020. Affirmed.

*Gerald E. Wells*, of Jerry Wells Attorney-at-Law, of Lawrence, was on the brief for appellant.

*Amy E. Norton*, assistant county attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Diantre Marquelle Lemmie shot and killed Adonis Loudermilk during a robbery. A jury convicted Lemmie of first-degree felony murder, aggravated robbery, conspiracy to commit aggravated robbery, criminal possession of a firearm, fleeing and eluding, and interference with law enforcement. Lemmie appeals, arguing that the district court judge made multiple evidentiary errors at trial and that insufficient evidence

2

supports his conviction for first-degree murder. His arguments fail; we affirm his convictions.

FACTUAL AND PROCEDURAL BACKGROUND

In the early morning of April 26, 2016, in the parking lot of the Starlite Motel in Salina, Loudermilk died from a gunshot wound. Police concluded that Lemmie and Amber Craig conspired to rob Loudermilk and that Lemmie shot and killed Loudermilk during the robbery. Before the robbery, Loudermilk, Craig, Lemmie, and a man named James Faircloth were in a room at the motel using methamphetamine and performing tattoo work.

The State charged Lemmie with first-degree felony murder, aggravated robbery, conspiracy to commit aggravated robbery, criminal possession of a firearm, fleeing and eluding, and interference with law enforcement. He and Craig were tried separately.

Before his trial, Lemmie moved to suppress evidence police obtained and derived from his cell phones. He alleged that police obtained his phone passcodes in violation of his Fifth Amendment right against self-incrimination.

The district judge conducted a hearing on the motion to suppress. Detective Amanda Londono testified that she interviewed Lemmie after he was arrested. Londono *Mirandized* Lemmie, and he said he understood his rights. Lemmie asked for a lawyer. Londono ended the interview.

After Londono ended her interview, police got a search warrant for Lemmie's two cell phones. Once the warrant issued, Londono met with Lemmie in jail, about 12 hours after Lemmie had invoked his *Miranda* rights. Londono provided Lemmie a copy of the

3

warrant, told him that the phones were locked, and asked for the phones' passcodes. Lemmie told her the codes. Londono left Lemmie and told other officers the codes. Law enforcement officers were then able to get into the phones using the codes, and they located incriminating Facebook messages.

At the motion to suppress hearing, Lemmie argued that the passcodes were testimonial. The State argued that Londono did not violate Lemmie's *Miranda* rights because the passcodes were not testimonial.

The district judge found that the disclosure of the passcodes was not compelled and the codes not testimonial. The district judge stated:

> "The production of the password and the pass code is a nonfactual statement in this Court's view that merely facilitated the production of evidence for which the State had already obtained a warrant based upon evidence independent of the defendant's statements, i.e. the password or pass code pattern."

Even if the passcodes were testimonial, the district judge also reasoned, they would nevertheless be admissible under the foregone conclusion doctrine. Before obtaining the passcode from Lemmie, the State had already established by independent means the existence, possession, and authenticity of the Facebook messages the State sought from the phone. Lemmie's counsel agreed that, prior to the request for the passcode, witnesses had provided law enforcement with information that the incriminating Facebook messages existed.

Lemmie also asked the district judge to rule on the admissibility of hearsay statements. The State said it intended to introduce three kinds of hearsay statements by Craig:  Faircloth's account of Craig's statements when Lemmie returned to the motel

4

room immediately before the shooting; Facebook messages between Craig and Lemmie on the morning of the murder; and Faircloth's account of Craig's statements in the motel room immediately after Lemmie shot Loudermilk. The State argued that all of these statements were admissible as coconspirator statements under K.S.A. 60-460(i)(2).

During argument on the hearsay issue, the district judge asked the State:

"State, I didn't hear any comment regarding whether the contemporaneous statement exception under subparagraph (d) would apply to Ms. Craig's comments at the time of the shooting which requires that while the declarant was perceiving the event or condition which the statement narrates, describes or explains, and while the declarant was under the stress of a nervous excitement caused by such a perception, and that information would be admissible. . . . What's the State's position as to the admissibility under that theory?"

The State then argued that Craig's statements after the shooting qualified as contemporaneous statements while the declarant was perceiving the event narrated, or while the declarant was under nervous excitement under K.S.A. 60-460(d)(1)-(2).

Lemmie countered that the coconspirator exception was not applicable because any conspiracy ended as soon as Loudermilk was shot. Lemmie also argued that Craig was not "unavailable"; that the statements were testimonial; and that admission of the statements would violate his constitutional right to confront witnesses.

The district judge ruled that Craig's statements to Faircloth after Lemmie shot Loudermilk were admissible as contemporaneous statements under K.S.A. 60-460(d) and as coconspirator statements under K.S.A. 60-460(i)(2). The district judge ruled that the Facebook messages and Craig's statements to Faircloth when Lemmie returned to the motel room before the shooting were admissible as coconspirator statements under

5

K.S.A. 60-460(i). The district judge further ruled that none of these statements or messages were testimonial.

Before trial, the State also moved to admit K.S.A. 60-455 evidence that "after [Loudermilk] left the motel room that the defendant became upset that a methamphetamine pipe went missing and that the victim . . . is the one who is alleged to have taken it." The State argued this information was relevant to "motive, identification, and intent." Lemmie opposed the admission of this evidence. The district judge ruled that the evidence was admissible because it went to motive and was part of the res gestae.

Because of Lemmie's appellate challenge to the sufficiency of the State's evidence against him, a thorough review of the testimony at trial is necessary.

Faircloth testified that on the night of April 25, 2016, he agreed to give tattoos to Lemmie, who went by "Tre Mack," and to Lemmie's friend, Mike Money. Faircloth dropped Lemmie and Money off at the Starlite Motel, retrieved his tattoo equipment from his home, and then returned to Room 120 of the Starlite around midnight. Inside the room were Lemmie, Loudermilk, and Craig; Money was gone. Later, another man—later identified as Chris Shelton—came out of the shower; he subsequently left on a bike.

Faircloth discussed and sketched out a tattoo for Lemmie. While they were working on the tattoo, the room occupants got high on meth. While the occupants passed around a pipe, it went missing and some got upset. Faircloth recounted:

"Q. And so when you say they were upset, who appeared upset about the pipe?

"A. It seemed like T-Rex [Faircloth's name for Lemmie] and Amber Craig.

"Q. And why do you say that?

6

"A. Because they were the ones wanting it.

"Q. And so when you say—this conversation about the pipe, did it occur between Amber Craig and T-Rex?

"A. I believe it was just an in-general question that they wanted to know where it was.

"Q. And when in the course of this evening did that get brought up?

"A. Right at the beginning of me getting there starting to clean and draw the pattern.

"Q. So when the issue with the pipe is first raised, had the Nebraska gentleman [Loudermilk] left the room yet?

"A. I think he did.

"Q. Had the gentleman who shaved off his mustache [Shelton], had he left?

"A. I believe he did too as well.

"Q. Did either Ms. Craig or T-Rex make any statements about what they were going to do to locate this pipe?

"A. Not that I recall.

"Q. Did you observe them looking around the room for it?

"A. Yes, ma'am.

"Q. And what did you observe?

7

"A. I just observed Amber Craig looking under a pillow, the side of the bed, looking around where she was sitting and stuff like that.

"Q. Did either T-Rex or Amber Craig appear to find this pipe?

"A. Not that I know of, no.

"Q. Nobody stood up and said I found it, anything like that?

"A. No, ma'am."

At one point, Loudermilk and Craig chatted; Faircloth overheard Craig say something to the effect that her "premium rates" were high. Shortly after this, Loudermilk went into the bathroom with Craig for about 20 or 30 minutes. After they left the bathroom, Loudermilk left the room. Craig came and sat on the bed and spoke with Lemmie while Faircloth worked on the tattoo. Faircloth overheard some of this conversation: Craig said she wanted a gold chain; Lemmie said she could have it, but Craig said that Lemmie would have to take it. Craig also injected Faircloth with meth while he was tattooing Lemmie.

After Faircloth finished Lemmie's tattoo about 4 a.m., Lemmie asked Faircloth to drop him off at a house on North 12th Street. Faircloth obliged. Faircloth then returned to the Starlite. When Faircloth went back into the motel room, Craig asked him to trade sex for a tattoo. Faircloth agreed. Faircloth and Craig had sex, and then Faircloth took a shower.

When Faircloth got out of the shower, Lemmie was back in the room; he had changed into dark clothes. Lemmie asked Craig, "[W]here is he[?]" Craig responded that "he" was asleep in his truck. Lemmie told Craig to "go wake his ass up." Craig went out

8

to the parking lot, then came back inside. Then Lemmie went into the parking lot. Faircloth heard Lemmie say, "I know you got it." Then Faircloth heard multiple gunshots. Craig squatted down in front of the door and said, "I didn't think he would do it." Faircloth asked what happened, and Craig said, "[H]e killed him." Faircloth called 911. Then Faircloth told Craig to take cover in the bathroom; Craig did not listen but instead gathered her possessions in a duffle bag. Craig tried to leave through the front door, but Faircloth would not let her.

Police arrived on the scene and found Loudermilk dead on the ground near an SUV in the Starlite's parking lot. Police found two .22 caliber casings and five .22 caliber live rounds near the SUV. They discovered $1,100 in Loudermik's pocket. Inside Room 120, police found drug paraphernalia, including a pipe with residue; a syringe; a scale; and a spoon top. On the ground in the alley behind the room, police found a duffle bag containing women's clothing outside a broken window.

Police took Faircloth to the police station. He agreed to a DNA swab and a gunshot residue test. He gave oral and written statements. Police presented Faircloth with a photo lineup, and he identified Lemmie as the shooter.

Officer Ricardo Garcia testified that he spoke with Faircloth at the scene. Faircloth told Garcia he thought "Tre Mack" shot Loudermilk. Garcia also spoke with Shelton, who returned to the Starlite that morning. Shelton said that "Tre Mack" got a tattoo from Faircloth in Room 120 earlier in the evening.

Garcia used his phone to search online for "Tre Mack" and found a Facebook profile under that name. Officer Michael Baker, another police officer at the scene, recognized the man in the photos from the "Tre Mack" account as Lemmie.

9

During the investigation of Loudermilk's murder, Shelton also identified the man in the "Tre Mack" Facebook pictures as the man who got the tattoo. At trial, Shelton denied identifying Tre Mack's Facebook profile and denied that he said Lemmie was at the motel; he denied ever having seen Lemmie before.

Detective Tyler Goldsby testified that after the shooting, he reviewed security footage from a nearby business. The footage showed a white Chevy or GM pickup driving near the scene of the crime at the time of the shooting. As a result, Goldsby notified other officers to be on the lookout for a white Chevy or GM pickup.

Detective Chris Venables testified that he was assigned to scan license plates in the area of the Starlite immediately after the shooting to try to locate and apprehend Lemmie. At about 8:30 a.m., he drove into the alley between North 12th Street and North 13th Street. There, he observed a black male with dreadlocks and tattoos backing a white pickup out of a driveway. Knowing police were looking for Lemmie, a black man with dreadlocks and tattoos in a white pickup, Venables got out of his police car and told the driver to stop. When he got out of his car, Venables recognized the driver as Lemmie. Lemmie did not stop, instead speeding away. Venables pursued Lemmie to a parking lot; there Lemmie left the truck and ran around the corner of a building. After chasing Lemmie on foot, Venables and another officer were eventually able to catch and arrest him. Police also arrested Tyi Daniel, the truck's passenger.

After the arrests, Venables went back to the house on 12th Street where he had first encountered the pickup. Police obtained a warrant to search the house and surrounding yard. They found a gun case hidden behind a truck bed liner near a fence. It contained a .22 rifle loaded with a live round. In a trashcan a few feet away from the gun, police found Loudermilk's driver's license, Social Security card, birth registration card,

10

and credit card. Inside the house, police found a gold cross necklace and a heart necklace. Police also found a cell phone they believed belonged to Lemmie.

Lisa Hollander-Daniel testified that she lived in the home on North 12th Street with her son, Tyi. Tyi owned a white truck. The morning of April 26, 2016, she woke up early and went to the store to get cigarettes. On her way back from the store, about 6:30 a.m., she saw Tyi walking his dog a few blocks from her house. When she got back to her house, she saw Lemmie sitting on her front lawn. She said she did not keep guns at her house, but she admitted that she did not frequently check her son's bedroom to see if he had a gun.

Detective Matthew Halton testified that he compiled surveillance footage from the motel and nearby businesses at the time of the shooting. The State played a DVD of that security footage for the jury. The video showed a vehicle parking in an alley near the Starlite shortly before 6 a.m. A different camera then showed a tall dark figure walking up to the door of a Starlite room. The tall, dark figure interacted with at least one other person, a smaller individual, at the door of the motel room. That smaller individual went out to an SUV in the Starlite parking lot near the room, then returned to the room. Several minutes later, the smaller figure and the tall dark figure both went to the SUV. The smaller figure walked back to the room at 6:06 a.m. Shortly after, the video captured two muzzle flashes. After the muzzle flashes, the tall figure ran away from the SUV into the middle of the parking lot before returning to the SUV. The tall figure then ran away from the SUV again, returned again, and then finally ran away from the parking lot for the last time at 6:08 a.m. In all, the tall figure returned twice to the SUV in the 90 seconds following the shooting. The video from other cameras showed a white pickup truck leaving the alley a few minutes later.

The State also introduced into evidence a still image of a white pickup driving near the Starlite Motel near the time of the shooting. The pickup had what appeared to be a long gun bag in its bed.

The State's trial evidence also included Londono's testimony about obtaining the phone passcodes from Lemmie. Detective Andrew Zeigler detailed obtaining search warrants for Facebook accounts under "Amber Craig" and "Tre Mack," and Detective Crystal Hornseth described reviewing the Facebook records for the "Tre Mack" account. The State introduced Facebook messages between accounts belonging to "Tre Mack" and "Amber Craig" that read:

> Tre Mack, 4:48 a.m.: "I'm goin to get my gun."
>
> Craig, 4:49 a.m.: "Ight but I gotta act like I don't know about it . . . he says there's more in his truck . . . but idk."
>
> Tre Mack, 5:36 a.m.: "He still in there."
>
> Craig, 5:37 a.m.: "Message me."
>
> Craig, 5:37 a.m.: "Yeah."
>
> Tre Mack, 5:38 a.m.: "Ok otw."
>
> Craig, 5:41 a.m.: "Okay we are starting mine now . . . dude is still in car sleeping."

Lemmie renewed his objection to the Tre Mack-Craig Facebook messages "based upon the previous objections [he had] made." The district judge overruled the objection.

12

The State also introduced messages between "Tre Mack" and an account for "KiKi Williams" that read:

> Tre Mack, 8:01 a.m.: "Can I cum stay with u for a lil."
>
> Williams, 8:09 a.m.: "Are you OK[?]"
>
> Tre Mack, 8:12 a.m.: "No."
>
> Tre Mack, 8:13 a.m.: "Imma do whatever to get there."

Forensic pathologist Erik Krag Mitchell explained to the jury that Loudermilk died from a gunshot that pierced his lungs and aorta. The pathologist recovered a bullet inside Loudermilk's chest. KBI firearm examiner James Stevens testified that the rifle recovered from the backyard of the home on 12th Street fired the bullet found in Loudermilk's body.

In its case, the defense called one of Lemmie's cousins, Dorian Flournoy, to the stand. Flournoy testified that the gold cross necklace recovered from Daniels' house was Lemmie's and that he had received it as a gift from his girlfriend. The cousin also testified that the "Tre Mack" Facebook account had been changed since Lemmie was arrested in April 2016. The account now used the name "Timmy Quopo" and showed active posting of content.

Lemmie's ex-girlfriend also testified, saying that she bought him a gold cross necklace in 2013. Lemmie also introduced photographs from 2014 or 2015 that showed him wearing a gold cross necklace.

13

The jury found Lemmie guilty on all counts, and the district judge sentenced him to 83 months for aggravated robbery, 34 months for conspiracy to commit aggravated robbery, 9 months for criminal possession of a firearm, 7 months for fleeing and eluding, 6 months for interference with law enforcement, and life with a minimum of 25 years for first-degree murder. The judge ran all of the sentences consecutive to each other, except for the 6-month sentence for interference with law enforcement, which he ordered to run concurrent to all other counts.

## DISCUSSION

*Phone Passcodes*

Lemmie first argues in this appeal that admission of Londono's testimony about him giving her the phone passcodes violated his Fifth Amendment right against self-incrimination.

> "When asked to review the violation of a defendant's Fifth Amendment right against self-incrimination, this court reviews the district court's factual findings using a substantial competent evidence standard, but the ultimate legal conclusion is reviewed as a question of law using an unlimited standard of review." *State v. Carapezza*, 286 Kan. 992, Syl. ¶ 11, 191 P.3d 256 (2008).

If an error occurred, we apply the constitutional harmlessness standard from *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011). Under that standard, an error is harmless if this court is "persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, i.e., there is no reasonable possibility that the error contributed to the verdict." *State v. Salary*, 301 Kan. 586, 607, 343 P.3d 1165 (2015).

14

The testimonial status of passcodes and passwords is a rich and rapidly developing area of law this court has not yet addressed. See generally Sacharoff, *Unlocking the Fifth Amendment: Passwords and Encrypted Devices*, 87 Fordham L. Rev. 203 (2018). However, this court need not plow this ground and whether it supports the existence of error today because, as the State argues, any possible violation of Lemmie's Fifth Amendment right in this case was undoubtedly harmless.

At trial, Londono testified that Lemmie provided the passcodes. But no witness testified that anything remotely incriminating was found on those cell phones. In fact, no witness testified about the contents of the cell phones at all. As Lemmie conceded pretrial, the witnesses' discussion of the incriminating Facebook messages could not have been excluded by reliance on his Fifth Amendment argument.

Because the admission of Londono's testimony that Lemmie knew the passcodes to the two phones in no way contributed to the jury's verdict in this case, we are assured that the constitutional harmless error standard is met.

*Admission of Hearsay Statements*

Lemmie next argues that the district judge erred by admitting Faircloth's testimony that immediately after the shooting Craig said, "[H]e killed him," and, further, that she "didn't think he would do it." Lemmie also argues the district judge committed judicial misconduct by asking the State if the contemporaneous statement hearsay exception applied to permit admission of Craig's statements. See K.S.A. 60-460(d)(1) (present sense impression); (d)(2) (excited utterance).

The district judge granted Lemmie a standing objection to admission of Craig's statements on hearsay grounds at trial, preserving Lemmie's first line of attack for this

15

court's review under K.S.A. 60-404. We may consider allegations of judicial misconduct on appeal absent a contemporaneous objection below. *State v. Lyman*, 311 Kan. 1, 34, 455 P.3d 393, 416 (2020).

Although we question whether Craig's second statement qualifies as hearsay—a statement by an out-of-court declarant admitted to prove the truth of the matter asserted—we need not pause to analyze that issue here. Assuming both statements to be hearsay, "This court reviews a trial court's determination that hearsay is admissible under a statutory exception . . . for an abuse of discretion." *State v. Summers*, 293 Kan. 819, 827, 272 P.3d 1 (2012). "A district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact." *State v. Moore*, 302 Kan. 685, 692, 357 P.3d 275 (2015).

With respect to Lemmie's judicial misconduct claims, "[a]ppellate courts have unlimited review over allegations of judicial misconduct," and Lemmie as the party alleging judicial misconduct has the burden to show "that misconduct occurred and that the misconduct prejudiced the party's substantial rights." *Lyman*, 311 Kan. at 33-34, 455 P.3d at 416.

The district judge admitted Craig's statements on two grounds:  first, as the statements of a coconspirator under K.S.A. 60-460(i)(2); and, second, as contemporaneous statements under K.S.A. 60-460(d).

K.S.A. 60-460(i)(2) provides that the following hearsay statements are admissible:

"a statement which would be admissible if made by the declarant at the hearing if . . . the party and the declarant were participating in a plan to commit a crime or a civil wrong

16

and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination."

Lemmie argues that Craig's statements were not admissible as the statements of a coconspirator because "the conspiracy to rob Mr. Loudermilk was complete when Mr. Loudermilk was shot." According to Lemmie's logic, Craig's statements occurred after the shots rang out and thus were "beyond the scope of the conspiracy."

Lemmie provides no authority to support his contention that a conspiracy to commit robbery concludes once shots are fired. And the argument fails on its merits. The security footage of the parking lot showed that, over the course of 90 seconds after the shooting, Lemmie returned twice to the SUV where Loudermilk was dead on the ground. In light of the testimony about the money found in Loudermilk's pocket as well as the messages between Craig and Lemmie about committing a robbery, it is reasonable to conclude that Lemmie returned to Loudermilk's body to search it for money. In other words, he continued to act to complete the robbery while, according to Faircloth, Craig had made her statements "[i]mmediately after the shots" were heard. Thus, based on the evidence, the district judge could reasonably conclude that Craig made her statements "before [the robbery's] complete execution or other termination." K.S.A. 60-460(i)(2); *State v. Sharp*, 289 Kan. 72, 105, 210 P.3d 590 (2009) ("a conspiracy exists 'to the disposition of its fruits, and to acts done to preserve its concealment'"). The district judge did not abuse his discretion by admitting Craig's statements under K.S.A. 60-460(i)(2).

Lemmie next argues that the district judge committed judicial misconduct when he asked the State to address whether Craig's statements also met the contemporaneous statements exception under K.S.A. 60-460(d). That statute allows a judge to admit a hearsay statement if made "[w]hile the declarant was perceiving the event or condition which the statement narrates, describes or explains; [or] while the declarant was under the

17

stress of a nervous excitement caused by such perception." Lemmie argues that by doing so, the district judge effectively took up the State's cause and provided it with a ground for admission it previously failed to consider. This, he argues, violated his right to a fair and impartial trial.

This argument also fails. The district judge did not rely only on the contemporaneous statement exception to find Craig's statements admissible. The district judge also relied on the exception already advanced by the State, i.e., the coconspirator exception. A district judge admitting evidence on two grounds, including one originating with the court, when the one already advanced by a party would suffice is not judicial misconduct. Lemmie has not borne his burden to show misconduct that prejudiced his substantial rights. See *Lyman*, 311 Kan. at 34, 455 P.3d at 416.

*Sufficiency of the Evidence*

Lemmie also argues that the State introduced insufficient evidence to convict him of first-degree murder.

> "When a criminal defendant challenges the sufficiency of the evidence used to support a conviction, an appellate court looks at all the evidence 'in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' . . . A reviewing court 'generally will "not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations."' [Citations omitted.]" *State v. Harris*, 310 Kan. 1026, 1030, 453 P.3d 1172, 1177 (2019).

Far more than ample direct and circumstantial evidence in the record supports Lemmie's murder conviction.

The State introduced Facebook messages between Craig and Lemmie in which Lemmie said he was going to get his gun and apparently asked about Loudermilk's whereabouts before returning to the motel room. Faircloth testified that Lemmie returned to the motel room shortly before the shooting, told Craig to go "wake [Loudermilk's] ass up," and went outside after Craig returned to the motel room from the parking lot. Faircloth heard Lemmie say, "I know you got it," before hearing multiple gunshots. Hollander-Daniel placed Lemmie at her home shortly after the shooting, where police later recovered the murder weapon and contents of Loudermilk's wallet. And Faircloth identified Lemmie as the shooter both at the scene and in a later photo lineup. The footage from the security cameras in the area depict the commission of the crimes by a person matching Lemmie's description. We need say no more to reject Lemmie's sufficiency claim.

*K.S.A. 60-455 Evidence*

Lemmie next argues that the district judge erred by admitting Faircloth's testimony that Lemmie was upset over a meth pipe that went missing in the Starlite Motel room. Lemmie preserved this issue for review by objecting to the meth pipe testimony at trial. See K.S.A. 60-404.

Generally evidence of a criminal defendant's prior civil or criminal wrongs will not be admitted at trial. K.S.A. 2019 Supp. 60-455(a). Possession of drug paraphernalia is a crime. But the statute provides a list of exceptional scenarios in which a defendant's prior bad acts are admissible, and a three-part test from *State v. Gunby*, 282 Kan. 39, 56-57, 144 P.3d 647 (2006), guides a trial judge in applying the exceptions.

"The three-part *Gunby* test that a trial judge must use in determining whether to admit evidence under K.S.A. 2017 Supp. 60-455, the corresponding appellate standards of review, and the trial judge's duty to provide a limiting instruction are as follows:

"'First, the district court must determine whether the fact to be proven is material, meaning that this fact has some real bearing on the decision in the case. The appellate court reviews this determination independently, without any required deference to the district court.

"'Second, the district court must determine whether the material fact is disputed and, if so, whether the evidence is relevant to prove the disputed material fact. In making this determination, the district court considers whether the evidence has any tendency in reason to prove the disputed material fact. The appellate court reviews this determination only for abuse of discretion.

"'Third, if the fact to be proven was material and the evidence was relevant to prove a disputed material fact, then the district court must determine whether the probative value of the evidence outweighs the potential for undue prejudice against the defendant. The appellate court also reviews this determination only for abuse of discretion.

"If the evidence meets all of these requirements, it is admitted, but in a jury trial the district court must give the jury a limiting instruction telling the jury the specific purpose for which the evidence has been admitted (and reminding them that it may only be considered for that purpose).' [Citations omitted.]" *State v. Haygood*, 308 Kan. 1387, 1392-93, 430 P.3d 11 (2018).

Before this court, Lemmie argues that evidence about the missing meth pipe was not relevant, and that it was more prejudicial than probative. Under the test set forth above, we review both contentions under an abuse of discretion standard.

At this point, it is helpful to return to the record to review the evidence as it actually was presented to Lemmie's jury. While Faircloth's testimony was inconsistent and meandering, he eventually testified about the meth pipe and the upset that accompanied its disappearance:

"Q. And so when you say they were upset, who appeared upset about the pipe?

"A. It seemed like T-Rex [Faircloth's name for Lemmie] and Amber Craig.

"Q. And why do you say that?

"A. Because they were the ones wanting it.

"Q. And so when you say—this conversation about the pipe, did it occur between Amber Craig and T-Rex?

"A. I believe it was just an in-general question that they wanted to know where it was.

"Q. And when in the course of this evening did that get brought up?

"A. Right at the beginning of me getting there starting to clean and draw the pattern.

"Q. So when the issue with the pipe is first raised, had the Nebraska gentleman [Loudermilk] left the room yet?

"A. I think he did.

"Q. Had the gentleman who shaved off his mustache [Shelton], had he left?

"A. I believe he did too as well.

"Q. Did either Ms. Craig or T-Rex make any statements about what they were going to do to locate this pipe?

"A. Not that I recall.

"Q. Did you observe them looking around the room for it?

"A. Yes, ma'am.

"Q. And what did you observe?

"A. I just observed Amber Craig looking under a pillow, the side of the bed, looking around where she was sitting and stuff like that.

"Q. Did either T-Rex or Amber Craig appear to find this pipe?

"A. Not that I know of, no.

"Q. Nobody stood up and said I found it, anything like that?

"A. No, ma'am."

And a detective testified that when he interviewed Faircloth, Faircloth said "Tre Mack, Amber Craig and [Loudermilk] were smoking meth in the motel room." Faircloth then said that people in the room were upset a meth pipe went missing.

The district judge ruled in part the meth pipe testimony was relevant because "the use of methamphetamine, the missing methamphetamine pipe are intertwined as relevant aspects of motive, and the Court is considering as well the . . . . logical connection and necessary connection to the crime and the circumstance." Motive is among the material facts for which other crimes and civil wrong evidence is admissible. K.S.A. 2019 Supp.

22

60-455(b). We reject Lemmie's arguments that "[t]here is no evidence that the meth pipe was involved in any way with" Loudermilk's death, because Lemmie "is not accused of stealing a meth pipe as a basis of the robbery [underlying the first-degree murder charge]" and questioning whether it is possible to steal something that is "already yours." As the State argued below, Lemmie could easily have had multiple, potentially overlapping motives for robbing and shooting Loudermilk. The district judge did not make an error of fact or law when he concluded the missing meth pipe was relevant to motive; nor was the judge's conclusion arbitrary or unreasonable.

On the balance of probative value and prejudice, the district judge ruled that "a limiting instruction would cure any concern the Court would have" and an appropriate instruction was given. Again, we see no abuse of discretion in this process or its conclusion. Lemmie's assertion that evidence of his drug use, particularly methamphetamine use, would generate "universal scorn" among jurors is unconvincing. The most serious of the crimes on which Lemmie stood accused were far more likely to generate such scorn; the evidence that Lemmie was a drug user was minimal in comparison. It is also worth noting that, to the extent drug use exerted influence on the jury, it also would have affected the testimony of Faircloth, the State's most valuable witness. And, finally, as outlined above, the meth pipe evidence was probative on motive, helping to explain Lemmie's willingness to target a man who was, before that day, a stranger to him.

*Cumulative Error*

Lemmie's last appellate argument is that cumulative error deprived him of a fair trial, requiring reversal of his convictions. Even if we assume one nonreversible error with respect to the passcode testimony, cumulative error does not apply. "One error cannot support reversal under the cumulative error doctrine." *State v. Carter*, 284 Kan.

23

312, 332, 160 P.3d 457 (2007). In the alternative, if no error exists, the cumulative error doctrine still cannot apply. "When this court finds that no errors were committed, the cumulative error doctrine does not apply." *State v. Bollinger*, 302 Kan. 309, 324, 352 P.3d 1003 (2015).

CONCLUSION

Any error in admitting evidence of the phone code obtained from Lemmie was harmless. The district judge did not err by admitting any of the other evidence challenged by Lemmie, and sufficient evidence supported his murder conviction. We therefore affirm the judgment of the district court.

MICHAEL E. WARD, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Ward was appointed to hear case No. 119,439 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.