IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,936

STATE OF KANSAS,
*Appellee*,

v.

ROBERT LEE HARRIS JR.,
*Appellant*.

SYLLABUS BY THE COURT

1.

The privilege against self-incrimination under the Fifth Amendment to the United States Constitution applies only when the accused is compelled to make a testimonial communication that is incriminating.

2.

The procedural safeguards adopted by the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), protect individuals from the inherent compulsions of the interrogation process.

3.

A statement is not compelled under the Fifth Amendment if an individual voluntarily, knowingly, and intelligently waives the constitutional privilege against self-incrimination. Without a *Miranda* advisory, however, a suspect's unwarned statement during custodial interrogation is presumed to be compelled and therefore involuntary.

4.

If a suspect waived the constitutional rights explained in an earlier *Miranda* warning, the question of whether a renewed *Miranda* warning is required at the start of a new questioning session boils down to whether—considering the totality of the circumstances—the suspect continues to understand and voluntarily waives the constitutional rights explained in the initial *Miranda* warning.

5.

Even when police have complied with the procedural safeguards of *Miranda*, a defendant's statement to the police may still be involuntary, and therefore inadmissible, if it was extracted by impermissible government coercion.

6.

Coercive police tactics fall into two broad categories: those that are inherently coercive, resulting in a per se violation of the Due Process Clause, and those that are coercive under the circumstances given the nature of the interrogation and the unique traits of the individual suspect.

7.

Advising an accused that officers can obtain an order compelling fingerprint access or the passcode to unlock a cell phone is not inherently coercive if officers have a reasonable basis to believe that a court will issue such an order.

8.

Analysis of coercion based on the nature of the interrogation and the unique traits of the individual suspect requires courts to assess the totality of the circumstances to determine whether the suspect's statement was a voluntary act of free and independent will or the result of impermissible coercion that overcame the suspect's rational intellect and free will.

Appeal from Johnson District Court; N<small>EIL</small> B. F<small>OTH</small>, judge. Oral argument held September 10, 2024. Opinion filed January 31, 2025. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, argued the cause and was on the briefs for appellant.

*Kendall S. Kaut,* assistant district attorney, argued the cause, and *Sommer Mackay*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

S<small>TANDRIDGE</small>, J.:  A jury convicted Robert Lee Harris Jr. of first-degree premeditated murder of his wife. On direct appeal, he challenges the district court's denial of his motion to suppress evidence retrieved from his locked cell phones. Specifically, he argues law enforcement obtained the passcodes necessary to unlock the cell phones in violation of his Fifth Amendment privilege against self-incrimination. But substantial competent evidence supports the district court's finding—based on its assessment of the totality of the circumstances—that law enforcement did not compel Harris to involuntarily make incriminating statements against his will. First, the initial *Miranda* warning given to Harris was still effective and his prior *Miranda* waiver had not expired when the detective asked him to provide the passcodes, so there is no presumption that Harris was compelled to involuntarily disclose them. Second, the detective who requested the passcodes had a reasonable basis to believe a court would issue an order to compel fingerprint access or the passcodes to open the phones when the detective informed Harris that he could obtain such an order, so this statement was not inherently coercive. Third, when we consider the totality of the circumstances, including the detective's statement, other interrogation details, and the individual characteristics of Harris as the accused, we are not persuaded Harris involuntarily provided the passcodes due to impermissible government coercion. Thus, the district court did not err by denying Harris' motion to suppress the evidence obtained from the search of the phones.

3

On January 8, 2018, Overland Park police responded to Harris' residence after a neighbor reported a disturbance from Harris' apartment, including hearing loud noises and a woman call out, "[H]elp me." The neighbor testified he saw Harris drag a large, heavy trash can down the apartment stairs to his wife's SUV and was concerned there could be a body in the trash can. While waiting for the police to arrive, the neighbor saw Harris make several trips to the dumpster while carrying smaller white trash bags.

Officers made contact with Harris at his apartment. After some discussion, Harris allowed officers into the apartment so they could determine whether there was an injured person inside. They found no one else in the apartment but noted broken glass on the floor and reddish-pink stains on the carpet in the dining/living room area. The officers ran a records check on Harris and discovered he had an outstanding warrant for his arrest.

Several hours later, Harris called 911 and reported his wife missing. The same officers from the previous call responded to his apartment, and Harris agreed to speak to them. Inside the apartment, officers noticed a rug that was previously in the living room had been moved to the dining room to cover the red stains they saw earlier. Harris admitted to moving the rug and eventually gave consent for officers to swab the stains to test for human blood. Officers also noted the smell of bleach inside the apartment, and Harris told them he had been cleaning.

The officers asked Harris to come outside to the patrol car to fill out paperwork regarding a missing person, including consent to search forms. Harris agreed. While in the patrol car, Harris used his cell phone several times. Officers asked Harris if he would go to a different location to speak with detectives. Harris initially agreed but then changed his mind. At that point, officers arrested Harris for the outstanding warrant. In a

search incident to the arrest, officers found two cell phones in Harris' pockets, among other items.

Officers transported Harris to the Tomahawk Ridge police station, where he was held for questioning overnight and interviewed for several hours by Detectives Erin Johnson and Marcus Meyer. Before asking any questions, Detective Meyer read Harris the *Miranda* warning advising Harris of his constitutional rights. Video footage shows Harris seated in an interview room, wearing leg shackles but no handcuffs. Harris said he understood his rights and agreed to answer some questions.

The first interview lasted approximately one and a half hours, at which point Harris invoked his right to remain silent. Detectives stopped asking questions at that time and left the room. They told Harris to knock on the door if he changed his mind. Less than 10 minutes later, Harris knocked on the door and asked to speak with the detectives. When they reentered, Harris asked how it worked to get an attorney. Detective Meyer explained the court would appoint one after Harris was arraigned. Harris then asked, "[W]hat happens next?" Detectives interpreted this question as Harris wanting to talk further about the investigation. Detective Meyer then asked Harris where his wife was and ultimately accused Harris of lying when Harris claimed not to know.

During this second stage of the interview, which lasted about 50 minutes and into the morning of January 9, Harris initially denied having anything to do with his wife's disappearance. But Harris later told detectives he and his wife had an argument that turned into a physical altercation. He then admitted that he held her down until she died, probably by suffocation. Detective Meyer pressed Harris on what he had done with his wife's body, suggesting things would be better for Harris if he told the truth, but making no specific promises. Detective Meyer told Harris that his wife's family deserved to know where she was for their peace of mind and to give her a proper burial. Harris eventually told detectives where he had disposed of his wife's body and pointed to a map revealing a

location of East 163rd Street and Kentucky Road in Raymore, Cass County, Missouri. Detectives drove to that location and found a body, later identified as Harris' wife, wrapped in black trash bags. Autopsy results indicated her cause of death was asphyxiation by manual strangulation.

Also on January 9, law enforcement obtained a search warrant for the two cell phones—a Samsung Galaxy S7 and an iPhone 6s—recovered from Harris during his arrest. The warrants did not contain any language about the method for unlocking the devices. Around 3 p.m. that day, Detective Mike Melvin and another detective went to the Johnson County Detention Center, met with Harris in an interview room at the jail, served him the search warrants, and asked him for the passcodes to access information on the phones. They did not re-*Mirandize* Harris before asking him for the passcodes. While he was reading the search warrant, Harris asked if this was something he needed an attorney for, and Detective Melvin replied that "it was up to [Harris]." Detective Melvin then advised Harris that officers could obtain a court order compelling Harris to provide fingerprint access or the passcodes. Shortly after, Harris provided a passcode for the iPhone and a passcode pattern to open the Samsung.

The detectives ultimately extracted incriminating data from the devices, including call logs, text messages, internet history, and search results. The call logs and text messages revealed that Harris lied to his wife about going to work on January 8, lied to his boss about being in a car accident on January 8 to explain why he could not go to work, and asked his wife to come home for lunch because he was feeling sick. The extraction also revealed internet search queries for, "How long does it take someone to die in a plastic bag?" and, "How long does it take to die of plastic bag suffocation?" These internet searches were conducted early in the morning on January 8, starting at 5:44 a.m.

Harris filed a pretrial motion to suppress the cell phone evidence, claiming law enforcement obtained the passcodes required to extract this evidence in violation of his Fifth Amendment privilege against self-incrimination. After reviewing the parties' briefs and hearing testimony on the matter, the district court made a number of factual findings and ultimately concluded Harris "voluntarily disclosed his cell phone passcodes, knowing the incriminating information they might yield" during the subsequent interrogation. Given its finding that the disclosure was voluntary, the district court denied Harris' motion to suppress.

ANALYSIS

On appeal, Harris claims the district court erred in denying his motion to suppress the cell phone evidence. In support, he argues the detectives violated his Fifth Amendment privilege against self-incrimination by compelling him to involuntarily disclose his cell phone passcodes.

When a defendant moves to suppress evidence based on a violation of the Fifth Amendment privilege against self-incrimination, the State bears the burden to prove, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights. *Colorado v. Connelly*, 479 U.S. 157, 168-69, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). When reviewing a district court's ruling on a motion to suppress, the appellate court reviews the factual underpinnings of the ruling under a substantial competent evidence standard, but it reviews the ultimate legal conclusion drawn from those facts de novo. It does not reweigh the evidence, assess witness credibility, or resolve conflicting evidence. *State v. Younger*, 319 Kan. 585, 602, 556 P.3d 838 (2024).

The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "The resulting privilege against compulsory self-incrimination fulfills the

7

essential role in our adversarial justice system of ensuring the State achieves criminal convictions by its own efforts, not by the forced disclosures of the accused." *State v. Showalter*, 319 Kan. 147, 154, 553 P.3d 276 (2024) (citing *Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 55, 84 S. Ct. 1594, 12 L. Ed. 2d 678 [1964]; *Ullmann v. United States*, 350 U.S. 422, 427, 76 S. Ct. 497, 100 L. Ed. 511 [1956]).

Although the privilege must be liberally construed, it "does not independently proscribe the compelled production of every sort of incriminating evidence." *Fisher v. United States*, 425 U.S. 391, 408, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976); *Hoffman v. United States*, 341 U.S. 479, 486, 71 S. Ct. 814, 95 L. Ed. 1118 (1951). Instead, the privilege applies only when the accused is (1) compelled (2) to make a testimonial communication (3) that is incriminating. *Showalter*, 319 Kan. at 155 (citing *Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S. 177, 189, 124 S. Ct. 2451, 159 L. Ed. 2d 292 [2004]).

1. *Compelled disclosure*

Harris makes two arguments to support his claim that he was compelled to involuntarily disclose the passcodes. First, he argues the detectives' failure to re-*Mirandize* him before asking for the cell phone passcodes creates a presumption that he was compelled to involuntarily disclose them. Second, he claims the detectives used coercive tactics to overcome his free will, which compelled him to involuntarily disclose the passcodes.

a. Miranda

In *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the United States Supreme Court adopted procedural safeguards to protect individuals from the "inherent compulsions of the interrogation process." The "main

8

purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel." *Berghuis v. Thompkins*, 560 U.S. 370, 383, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010). Thus, before an individual in custody is subjected to questioning, law enforcement must inform the individual that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444.

A suspect may waive the rights in the *Miranda* warning if the waiver is made voluntarily, knowingly, and intelligently. *Colorado v. Spring*, 479 U.S. 564, 573, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987) ("A statement is not 'compelled' within the meaning of the Fifth Amendment if an individual 'voluntarily, knowingly and intelligently' waives his constitutional privilege.") (quoting *Miranda*, 384 U.S. at 444). Without the *Miranda* advisory, however, an unwarned custodial statement is presumed to be "compelled" and therefore involuntary. Unwarned custodial statements are generally inadmissible at trial in the State's case-in-chief. *Oregon v. Elstad*, 470 U.S. 298, 317-18, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985).

Harris does not challenge the district court's finding that he was properly advised of his constitutional rights under *Miranda* and that he voluntarily, knowingly, and intelligently waived those rights during his initial interrogation on the evening of January 8 and into the early morning hours of January 9. Thus, he has abandoned those particular arguments on direct appeal. See *State v. Davidson*, 315 Kan. 725, 728, 510 P.3d 701 (2022) ("[A] party waives or abandons any argument not made on appeal[.]"). Rather, Harris argues the *Miranda* warning and his waiver had expired by the afternoon of January 9, when officers served him with a search warrant for the cell phones and asked him to provide the passcodes. Without a renewed *Miranda* warning for this second interrogation, Harris claims his disclosure of the passcodes was compelled and therefore involuntary.

Once the police provide the *Miranda* warning at the start of a custodial interrogation and the suspect understands and waives these rights, this court has generally found it unnecessary for the police to repeat the *Miranda* warning at each successive interview. *State v. Mattox*, 280 Kan. 473, 488, 124 P.3d 6 (2005); *State v. Pyle*, 216 Kan. 423, Syl. ¶ 9, 532 P.2d 1309 (1975). "To adopt an automatic second warning system would be to add a perfunctory ritual to police procedures rather than provide the meaningful set of procedural safeguards envisioned by *Miranda*." *State v. Boyle*, 207 Kan. 833, 841, 486 P.2d 849 (1971). That said, a renewed *Miranda* warning may be necessary under some circumstances. The question of whether a suspect needs a renewed *Miranda* warning at the start of a new questioning session boils down to whether—considering the totality of the circumstances—the suspect continues to understand and voluntarily waives the constitutional rights explained to them in the initial *Miranda* warning. See *State v. Nguyen*, 281 Kan. 702, 723-24, 133 P.3d 1259 (2006) (citing *Brown v. State*, 661 P.2d 1024, 1031 [Wyo. 1983] [considering totality of circumstances to determine "'whether the prior [*Miranda*] warnings were effective to sufficiently advise the accused of his constitutional rights so that the prior voluntary and knowing waiver of those rights continued its efficacy'"]).

This court has considered several factors when conducting a totality-of-the-circumstances analysis, including, but not limited to, the time between the valid waiver and the subsequent interrogation; whether the suspect remained in custody during the elapsed time; whether intervening circumstances occurred in the interim that would affect the suspect's understanding of the original warning; the suspect's age, education level, state of mind, and prior experience with law enforcement; and whether there was a change in location or law enforcement personnel between the first and subsequent interrogations. See, e.g., *Mattox*, 280 Kan. at 487-88 (holding renewed *Miranda* warning not required after a valid waiver if suspect remained in custody during the elapsed time and the subsequent interrogation took place within a reasonable time, so long as nothing occurred in the interim that would affect suspect's understanding of the original warning);

10

*Nguyen*, 281 Kan. at 724 (holding *Miranda* warnings and waiver did not expire over the course of five to eight hours when adult suspect was transported to jail by a different officer to a different location, even though suspect spoke limited English and did not have an interpreter on the drive); *State v. Davis*, 268 Kan. 661, 678, 998 P.2d 1127 (2000) (holding a renewed *Miranda* warning not required when 17-year-old juvenile defendant with significant experience with law enforcement was transported to a detention center and made further incriminating statements to a worker).

Our totality of the circumstances analysis is flexible in that we have never required the district court to consider a discrete set of factors to decide whether a renewed *Miranda* warning is required. But Harris urges us to do so by adopting an exclusive list of factors used by other state jurisdictions, specifically:

> "'(1) the length of time between the giving of the first warnings and the subsequent interrogation . . . ; (2) whether the warnings and the subsequent interrogation were given in the same or different places . . . ; (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers . . . ; (4) the extent to which the subsequent statement differed from any previous statements . . . ; (5) the apparent intellectual and emotional state of the suspect.'" *In re Interest of Miah S.*, 290 Neb. 607, 615, 861 N.W.2d 406 (2015).

See also *State v. Williams*, 26 Neb. App. 459, 920 N.W.2d 868 (2018) (citing *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 [2024]).

We decline Harris' invitation to adopt an exclusive list of factors to decide whether a renewed *Miranda* warning is required. The United States Supreme Court has explained that a flexible "totality-of-the-circumstances analysis" is preferred when assessing whether a prior *Miranda* waiver is still valid because this approach ensures "inquiry into all the circumstances surrounding the interrogation." *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979) (explaining this approach *requires* courts to

11

consider *all* the relevant circumstances of each particular case "to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel"). And this court recently conveyed a similar message in *State v. G.O.*, 318 Kan. 386, 403, 543 P.3d 1096 (2024), by articulating a list of "potential" factors to be considered in a voluntariness inquiry while making clear that "trial judges need not address every factor" so long as judges articulate the factors on which their findings are based.

Consistent with *Mattox*, the district court here examined the totality of the circumstances and found the following factors relevant:

"15 hours earlier [Harris] knew his rights, waived his rights, then successfully asserted his rights before waiving them again. There were no significant intervening circumstances before the detectives came back to him the same day. The question defendant asked, essentially 'do I need a lawyer for this,' indicates that he knows he has the right to a lawyer, he is just questioning whether he needs one. He also knows from his earlier interrogation that if he asserts his right, it will be honored. He was told that it was up to him to make that choice."

Based on these articulated factors, the district court concluded the initial *Miranda* warning provided to Harris was still effective and his prior *Miranda* waiver had not expired when officers served him with a search warrant for the cell phones and asked him to provide the passcodes.

But Harris challenges the district court's conclusion, claiming the totality-of-the-circumstances analysis supporting it was flawed and incomplete. He claims it was flawed because the district court minimized the significance of the 15-hour gap between the two interrogations in reaching its conclusion. And he claims it was incomplete because the court failed to consider that the two interrogations took place in different locations and

12

related to different subjects and that the State failed to introduce evidence of his state of mind.

The record does not support Harris' claim that the court minimized the significance of the 15-hour gap between the two interrogations. Consistent with *Mattox*, the district court expressly recognized that any lapse of time between a *Miranda* waiver and subsequent interrogation "must be assessed in view of defendant's knowledge and conduct and other relevant circumstances." Although the 15-hour gap between interrogations is longer than this court's previous decisions holding a *Miranda* warning did not expire, Harris does not allege an intervening event occurred during the gap that impacted his continued ability to understand and waive his *Miranda* rights at the second interrogation. We find no error in the district court's assessment of this factor.

As for Harris' claim that the district court did not expressly consider the changed location, the differences in subject matter, and his state of mind, Harris fails to explain how the court's failure to expressly consider these missing factors tainted the waiver of his *Miranda* rights. Again, the key consideration in deciding whether a renewed warning is necessary is whether the suspect continues to understand and voluntarily gives up *Miranda* rights at the start of the new questioning session. Simply identifying factors that the district court did not consider in its totality-of-the-circumstances analysis is not enough to establish that the court erred in concluding his *Miranda* waiver was still valid when questioning resumed.

In sum, we find substantial competent evidence supports the district court's finding, based on its assessment of the totality of the circumstances, that "there is nothing to indicate that defendant Harris did not know or understand his *Miranda* rights when he was re-interviewed on the afternoon of January 9, 2018." Thus, we conclude the detectives were not required to readminister the *Miranda* warning before asking Harris to provide the cell phone passcodes. Because the initial *Miranda* warning and Harris' prior

13

*Miranda* waiver were still effective at the time, no presumption of compulsion attached to Harris' disclosure of the passcodes.

    b. *Coercive tactics*

        In addition to asserting his disclosure of the cell phone passcodes was compelled in the absence of a renewed *Miranda* warning, Harris also claims his disclosure was involuntary due to law enforcement coercion. As evidence of coercion, Harris points to Detective Melvin's request that he provide the passcodes and the subsequent statement that officers could obtain a court order compelling him to provide fingerprint access or the passcodes. Because the issue of whether this information can be compelled is still an open legal question in Kansas, Harris argues the detective's assertion "was not necessarily a true statement" and thus coercive. He contends the district court should have considered this coercive tactic as a factor in its voluntariness analysis and suppressed the electronic evidence derived from the phones on this basis.

        Even when police have complied with the procedural safeguards of *Miranda*, a defendant's statement to the police may still be involuntary, and therefore inadmissible, if it was extracted by impermissible government coercion. *G.O.*, 318 Kan. at 397; see *Dickerson v. United States*, 530 U.S. 428, 444, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) ("The requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry."). Both the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment protect against involuntary confessions caused by coercive police tactics. *G.O.*, 318 Kan. at 397 ("The Fifth Amendment test for voluntariness substantially tracks the voluntariness test applied under the Due Process Clause of the Fourteenth Amendment.") (citing *Connelly*, 479 U.S. at 169-70). A statement is involuntary if obtained as a result of interrogation tactics that overcame a defendant's rational intellect and free will. *Connelly*, 479 U.S. at 164 ("Absent police conduct causally related to the [statement], there is simply no basis for concluding that any state actor has deprived a

criminal defendant of due process of law."). This standard balances the competing value of fairness to the accused against the legitimate interest of having effective law enforcement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 224-26, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).

Coercive police tactics fall into two broad categories: those that are inherently coercive, resulting in a per se violation of the Due Process Clause, and those that are coercive under the circumstances given the nature of the interrogation and the unique traits of the individual suspect. *G.O.*, 318 Kan. at 397 (citing *Miller*, 474 U.S. at 109). The first category includes "interrogation techniques that in isolation are inherently offensive to a civilized system of justice" and usually involve "coercive techniques that included extreme psychological pressure or brutal beatings and other physical harm." 318 Kan. at 397-98 (citing *Miller*, 474 U.S. at 109). The second category involves tactics that are coercive based on the details of the interrogation as they relate to the unique characteristics of the accused. 318 Kan. at 397-98 (citing *Miller*, 474 U.S. at 109-10). Analysis of coercion in a particular case requires courts to assess the totality of the circumstances and determine whether a defendant's statement was a voluntary act of his or her free and independent will or the result of impermissible coercion. 318 Kan. at 398 (citing *Connelly*, 479 U.S. at 165).

In support of his coercion argument, Harris cites to federal and state caselaw articulating the test for an involuntary confession obtained by inherently coercive tactics that include threats of violence and/or improper promises of benefit. See *Hutto v. Ross*, 429 U.S. 28, 30, 97 S. Ct. 202, 50 L. Ed. 2d 194 (1976); *State v. Brown*, 286 Kan. 170, 174, 182 P.3d 1205 (2008). We therefore assume Harris is arguing, at least tacitly, that Detective Melvin's statement about obtaining a court order to compel him to provide the passcodes was inherently coercive and thus constituted a per se violation of the Fifth Amendment.

Though in the context of assessing consent under the Fourth Amendment and not the voluntariness of statements under the Fifth Amendment, this court has held that an officer's threat to obtain a warrant based on probable cause is not inherently coercive if probable cause indeed exists. See *State v. Brown*, 245 Kan. 604, 612-13, 783 P.2d 1278 (1989) (consent to search was not coerced after officer stated a search warrant could be obtained because evidence established there would have been probable cause to conduct the search). Thus, notifying a person that a search warrant can be obtained is not inherently coercive if there is a basis for the warrant to issue. 245 Kan. at 612-13; see also *United States v. Creech*, No. 99-3205, 2000 WL 1014868, at *2 (10th Cir. 2000) (unpublished opinion) ("[W]here some basis exists to support an application for a search warrant, an officer's expressed intention to seek a search warrant in the absence of consent does not render a consent involuntary."). Extending this principle to the issue presented here, advising an accused that officers can obtain an order compelling fingerprint access or the passcode to unlock a cell phone is not inherently coercive if officers have a reasonable basis to believe that a court will issue such an order. Thus, to resolve Harris' claim of inherent coercion, we must decide whether Detective Melvin had a reasonable basis to believe that a court would issue an order to compel fingerprint access or the passcodes to the phones at the time the detective made this statement.

Appellate courts in Kansas have yet to address whether police can obtain a court order compelling an accused to provide fingerprint access or a passcode to a cell phone. And courts around the country are divided over the issue. See *State v. Lemmie*, 311 Kan. 439, 448-49, 462 P.3d 161 (2020) (opting not to delve into the nature of cell phone passcodes when any possible violation of the defendant's Fifth Amendment right was harmless); *Privilege Against Self-Incrimination as Applied to Compelled Disclosure of Password or Production of Otherwise Encrypted Electronically Stored Data*, 82 A.L.R. 7th art. 4 (2023) (collecting and discussing state and federal cases that show courts are split on whether compelled disclosure of cell phone passcodes are protected under the Fifth Amendment privilege against self-incrimination).

16

Relying on the unsettled nature of the issue, Harris argues Detective Melvin's statement that officers could obtain an order to compel fingerprint access or the passcodes was inherently coercive because it "was not necessarily a true statement." But in making this argument, Harris attempts to change the standard for assessing whether this police tactic was inherently coercive. Rather than evidence that there was a reasonable basis for law enforcement to believe the court will issue an order compelling fingerprint access or passcodes, Harris insists on absolute certainty that the court will do so. Harris provides no argument or legal authority to support this proposed change in the standard for assessing coercion in this context, and we find no reason to depart from the existing standard.

The record before us supports a finding that Detective Melvin had a reasonable basis to believe that a court would issue an order to compel fingerprint access or the passcode to the phones at the time the detective informed Harris that he could obtain such an order. Detective Melvin agreed he told Harris that officers could obtain "a judicial order compelling the defendant to either use his finger print or give up the pass codes or something of that nature" because Detective Melvin had obtained such an order in the past. Harris has provided no information to the contrary. And neither this court nor the United States Supreme Court prohibit a trial court from issuing an order compelling the disclosure of digital access credentials. Based on the evolving nature of digital privacy and security laws and Detective Melvin's past experience in obtaining an order compelling digital access credentials, the statement that officers could obtain such an order was not inherently coercive.

Alternatively, Harris argues coercion based on a totality of the particular circumstances of the interrogation and his own personal characteristics. As mentioned, this court has identified a non-exhaustive list of potential factors courts may consider in a voluntariness analysis relating to the details of the interrogation and the characteristics of the accused:

"Potential details of the interrogation that may be relevant include: the length of the interview; the accused's ability to communicate with the outside world; any delay in arraignment; the length of custody; the general conditions under which the statement took place; any physical or psychological pressure brought to bear on the accused; the officer's fairness in conducting the interview, including any promises of benefit, inducements, threats, methods, or strategies used to coerce or compel a response; whether an officer informed the accused of the right to counsel and right against self-incrimination through the *Miranda* advisory; and whether the officer negated or otherwise failed to honor the accused's Fifth Amendment rights.

"Potential characteristics of the accused that may be relevant when determining whether the officer's conduct resulted in an involuntary waiver of constitutional rights include the accused's age; maturity; intellect; education; fluency in English; physical, mental, and emotional condition; and experience, including experience with law enforcement." *G.O.*, 318 Kan. at 403.

These factors need not be equally weighted. Rather, any single factor or a combination of factors "'may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the [statement] was not therefore a free and voluntary act. [Citation omitted.]'" *G.O.*, 318 Kan. at 401 (quoting *State v. Sharp*, 289 Kan. 72, 81, 210 P.3d 590 [2009]).

The evidentiary record establishes that the interaction between the detectives and Harris was short, on the order of minutes, and essentially involved detectives serving Harris with the cell phone search warrants and asking him to provide the passcodes to unlock the phones. Harris was not unduly restrained, and the detectives did not raise their voices or behave in an aggressive manner. The tone of the interaction appears to have been conversational, and after a brief discussion, Harris provided the codes. In his *Miranda* argument, Harris described the circumstances leading up to this point as being "under interrogation and locked in the jail for at least seventeen hours" prior. In fact,

Harris was interrogated for two to three hours of the total time he was initially detained before being transported to jail, and the subsequent interrogation took place many hours later, though within the same day. Our caselaw indicates the duration and manner of the interrogations were reasonable. Thus, the circumstances of the interrogation in which detectives asked Harris to provide the passcodes were not unduly coercive.

Turning to potential vulnerabilities of the accused, Harris does not claim personal characteristics unique to him—like his age, level of education, background, or mental condition—impacted the voluntariness of his password disclosure. Indeed, the evidence showed Harris was 30 years old at the time, fluent in English, employed at a local cancer hospital, and highly involved as a leader in the church he attended. Nothing about Harris' personal characteristics leads us to believe he was particularly vulnerable to law enforcement pressure under the circumstances.

Although Harris may have felt pressure to provide the passcodes, the Fifth Amendment is not violated whenever a person feels "'pressure'" to speak; rather, to amount to compulsion, that pressure must overcome the "'resistance'" of the suspect such that his "'will [is] overborne.'" *Dickerson*, 530 U.S. at 434. There is no evidence here that Harris resisted Detective Melvin's request or that the detective's statement impaired Harris' capacity for self-determination and caused him to involuntarily provide the passcodes. Detective Melvin did not threaten adverse consequences if Harris refused to provide the passcodes. When the detective told Harris that officers could obtain an order compelling him to provide fingerprint access or the passcodes, Harris had a choice: he could provide access to the phones or return to his cell to wait for a court order. Harris chose to provide the passcodes and did so "pretty early on in the conversation."

The voluntariness test requires us to determine whether the State satisfied its burden to show Harris provided the passcodes as an exercise of his own free will or whether, as Harris claims, law enforcement coerced him to do so by overcoming his free

will—either because Detective Melvin's statement was inherently coercive or coercive under the totality of the circumstances. We conclude that Detective Melvin's statement was not coercive on its own or under the totality of the circumstances and that Harris provided the passcodes voluntarily of his own free will.

2. *Testimonial communication*

Harris also argues the disclosure of his cell phone passcodes to law enforcement was a testimonial communication subject to the Fifth Amendment privilege against self-incrimination and thus the evidence retrieved as a result should have been suppressed. Although the testimonial status of passcodes and passwords is a novel and developing area of law, this court has yet to reach the underlying merits of the issue. See, e.g., *Lemmie*, 311 Kan. at 448-49 (opting not to delve into the testimonial nature of cell phone passcodes when any possible violation of the defendant's Fifth Amendment right was harmless).

Given we have already determined Harris voluntarily disclosed his cell phone passcodes, it is unnecessary to decide in this case whether disclosure of the passcodes was testimonial because even if it was, the privilege against self-incrimination applies only when the accused is *compelled* to make such a disclosure. See *Showalter*, 319 Kan. at 155 (citing *Hiibel*, 542 U.S. at 189).

3. *Incriminating*

Neither party addresses whether the passcodes disclosed by Harris were "incriminating" for Fifth Amendment purposes. On this issue, the United States Supreme Court has held the Fifth Amendment's self-incrimination protection encompasses "compelled statements that lead to the discovery of incriminating evidence even though the statements themselves are not incriminating and are not introduced into evidence."

20

*United States v. Hubbell*, 530 U.S. 27, 37, 120 S. Ct. 2037, 147 L. Ed. 2d 24 (2000). But because we have determined Harris was not compelled to disclose his cell phone passcodes, we need not, and do not, address the incrimination element of the privilege.

CONCLUSION

Substantial competent evidence supports the district court's finding, based on its assessment of the totality of the circumstances, that Harris' disclosure of the cell phone passcodes was voluntary and not obtained in violation of his Fifth Amendment privilege against self-incrimination. The initial *Miranda* warning and Harris' waiver were still valid at the second interrogation, so a renewed *Miranda* warning was not needed. Further, Detective Melvin had a reasonable basis to believe a court would issue an order to compel fingerprint access or the passcodes to the phones at the time the detective informed Harris that he could obtain such an order, so this tactic was not inherently coercive. Finally, considering the totality of the circumstances, including the details of the second interrogation and Harris' specific characteristics, we conclude Harris provided the passcodes voluntarily of his own free will. Thus, the district court did not err by denying Harris' motion to suppress the evidence retrieved from the cell phones as a result of his voluntary disclosure of the passcodes.

Affirmed.